581 So.2d 31 (1991)
Samuel Jason DERRICK, Appellant,
v.
STATE of Florida, Appellee.
No. 73076.
Supreme Court of Florida.
March 21, 1991.
Rehearing Denied June 27, 1991.
*32 James Marion Moorman, Public Defender and Robert F. Moeller, Asst. Public Defender, Tenth Judicial Circuit, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen. and Stephen A. Baker, Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
Samuel Jason Derrick appeals his conviction for first-degree murder and sentence *33 of death for the murder of Rama Sharma. We have jurisdiction under article V, section 3(b)(1) of the Florida Constitution.
On June 25, 1987, at 6:30 a.m., Harry Lee found the body of Rama Sharma in a path in the woods near Sharma's Moon Lake General Store in Pasco County. Blood trailed from the body to a blood puddle twenty feet away. The police found a piece of a tee shirt near the body as well as two sets of tennis shoe prints, one set belonging to Harry Lee. The medical examiner found that Sharma had died from over thirty-one stab wounds and that he had died approximately ten to fifteen minutes after the last wound was inflicted.
Derrick was implicated in the murder by his friend, David Lowry. At trial Lowry testified that he and his wife visited Derrick on June 24 at Derrick's mother's house and that Derrick had knives out. Lowry drove Derrick to another friend's house, at which time Lowry noticed that Derrick had a knife in the back of his pants. At the time, Derrick was wearing a tee shirt, jeans, and tennis shoes. The friend's house was about two blocks from Sharma's store. At approximately 1:30 a.m. on June 25, Derrick showed up at Lowry's house in a sweaty condition and without a shirt. When Lowry drove Derrick home, Derrick told him that he had robbed the Moon Lake General Store. Derrick gave Lowry twenty dollars for gas. Later that day, after Lowry heard that Sharma had been killed, he asked Derrick whether he had killed him. Derrick admitted killing Sharma, stating that he had stabbed him thirteen times because Sharma kept screaming. Lowry testified that Derrick "kind of laughed and said it was easy." Lowry also noted that on June 25 Derrick had a new car that was worth approximately $200-$300. On June 29, Lowry notified the sheriff's department about Derrick's involvement in the murder.
After being arrested and advised of his rights, Derrick denied any knowledge of the murder to Detective Vaughn. Vaughn then advised Derrick that they had a witness, David Lowry. After denying that Lowry had told them anything, Derrick demanded, "I'd like to have him in front of me. Let him tell me." Vaughn then brought Lowry and Derrick into the same room and Derrick confessed to the murder. He stated that he went to Sharma's store to rob it and jumped Sharma as he left the store. Sharma turned to run back to the store. When Derrick grabbed him, Sharma turned around and saw that it was Derrick. Sharma started screaming and Derrick stabbed him "to shut him up." Derrick then took approximately $360 from Sharma's pocket. Derrick also admitted that he tore off a piece of his tee shirt at the scene because it had blood on it. After the murder, Derrick threw the knife into the woods and ran to Lowry's house. Derrick also stated that he lost the money and that he threw his shoes and some clothing into a pond. The police took Derrick to the Moon Lake General Store, and he showed them where he had attacked and murdered Sharma. The police never located the clothing, shoes, or knife.
At trial, several officers testified to Derrick's confession. They noted that after his initial confession his wife had been brought into the room. He had sobbed to her that he did not know why he killed Sharma and that he could not believe that he stabbed him over thirty times. He also had said that an aunt had always said that he was an "animal" and that she was right.
After the defense had presented two witnesses, they announced that they were calling Derrick to testify. At this point, the prosecutor announced that if Derrick testified that he had not committed the murder, he planned to call in rebuttal an inmate named Randall James. The prosecutor said that, after the first defense witness began to testify, he had received a note informing him that Detective Vaughn had just been told by James that Derrick told James that he had killed Sharma and that he would kill again. The prosecutor offered to make James available for a deposition.
Derrick's attorneys, who were public defenders, requested a recess to determine what to do because their office also represented *34 James[1] and they were therefore concerned about the implications of cross-examining James. The prosecutor indicated that it was his understanding that James was willing to waive the attorney-client privilege. After the recess, the judge removed the public defender's office from representing James in an effort to alleviate the conflict. Continuing to express concern over the dual representation,[2] Derrick's attorneys made a motion for mistrial which was denied. They then decided to rest without calling Derrick as a witness. The jury found Derrick guilty. Derrick's attorneys took James's deposition while the jury was deliberating.
At the penalty phase, the state again indicated it would call James as a witness. The defense objected both to the relevance of his testimony and to the limited amount of time they had had to conduct discovery concerning matters with which they might impeach James. The court denied the objection. As the first witness in the penalty phase, James testified that Derrick told him, "I killed the m____ f____, and I'll do it again." The court denied a motion for mistrial predicated upon James's testimony.
Derrick then presented several witnesses to testify that he was a good husband, father, and person and that he had suffered some physical and sexual abuse as a child. The jury recommended the death penalty by an eight-to-four vote. The judge imposed the death penalty, finding in aggravation that: 1) the murder was committed in the course of a robbery; 2) the murder was committed to avoid arrest; 3) the murder was especially heinous, atrocious, or cruel; and 4) the murder was committed in a cold, calculated, and premeditated manner.[3] In mitigation the judge found that Derrick was only twenty years old at the time of the murder. He found no other mitigation.
Derrick's first claim on this appeal is that the trial judge violated the principle of Richardson v. State, 246 So.2d 771 (Fla. 1971), when the prosecutor announced that James might testify during the guilt phase. Richardson requires that, when a discovery violation occurs, the trial judge must inquire into the circumstances of the discovery violation and its possible prejudice to the defendant. Smith v. State, 500 So.2d 125 (Fla. 1986). Derrick claims that the court did not make an adequate Richardson inquiry into the circumstances of the asserted discovery violation and the potential prejudice to Derrick. We reject this claim.
Under the facts of this particular case, we find no Richardson violation. First, we note that Derrick's attorneys specifically stated that they were not alleging a discovery violation; rather, they only claimed that because the state became aware of the witness so late that Derrick was prejudiced and a mistrial was the only adequate remedy. When the prosecutor disclosed that James might testify, he represented to the court that he had just become aware of James's potential testimony one hour earlier and that James had only spoken to Detective Vaughn that morning. He also stated that James was willing to waive his attorney-client privilege. Upon learning of James's potential testimony, the judge allowed the defense attorneys an approximately two-hour recess, with the understanding that at the end of the recess James would be available to be deposed. When court resumed after the recess, the judge removed the public defenders from representing James and the prosecutor again stated that James waived his attorney-client privilege. The public defenders again were given the opportunity to depose James but declined it. We believe these facts demonstrate that Derrick's attorneys were given ample opportunity to remedy any prejudice due to the late listing of James as a witness. When the motion for *35 mistrial was denied,[4] Derrick's attorneys made a tactical decision to rely upon the prosecutor's representations of what James's testimony would be and advised Derrick not to testify. We have never before held that a defendant was prejudiced by the late listing of a witness who never testifies at trial, and we decline to do so now. The fact that Derrick changed his defense strategy and decided not to testify did not provide grounds for mistrial. Any prejudice Derrick may have suffered by having first announced that he would testify was minimal.
Derrick's next claim is that he was prejudiced because he was shackled throughout the trial. We find no error since Derrick had been found in possession of a screw driver in the jail. Although we have recognized that shackling is an inherently prejudicial practice, the court can properly exercise its discretion to shackle "to ensure the security and safety of the proceeding." Stewart v. State, 549 So.2d 171, 174 (Fla. 1989), cert. denied, ___ U.S. ___, 110 S.Ct. 3294, 111 L.Ed.2d 802 (1990). Further, we note that efforts were made to hide the shackles from the jury's view.
We also reject Derrick's claim of prejudice with respect to media coverage of the trial. Referring to an article which had just appeared in a local newspaper, defense counsel moved the court to ask the jurors who had already been selected whether they had read it. The judge declined to do so. He also declined a motion to sequester the jury. However, the judge instructed the jury on several occasions to avoid any media coverage or other discussion of the case. At the close of the evidence, the judge inquired whether any of the jurors had read about the trial in the newspapers, and the jurors responded that they had not.
The Fifth District Court of Appeal has outlined the steps which should be taken when there is a claim that the jury has been improperly exposed to media coverage.
Initially, the trial court must determine whether the published material has the potential for prejudice. United States v. Perrotta, 553 F.2d 247 (1st Cir. 1977); Commonwealth v. Jackson, 376 Mass. 790, 383 N.E.2d 835 (Mass. 1978); Brown v. State, 601 P.2d 221 (Alaska 1979). If it does, then a two-step process is necessary. First, the court should inquire of the jurors as to whether any of them read the material in question. If none of the jurors read the material, then its publication could not have prejudiced the defendant and the trial may proceed. United States v. Carter, 602 F.2d 799 (7th Cir. 1979); United States v. Khoury, 539 F.2d 441 (5th Cir.1976). If any of the jurors indicate they have read the material, they must be questioned to determine the effect of the publicity, i.e., whether they can disregard what they read and render an impartial verdict based solely on the evidence at trial. See, e.g., Margoles v. United States, 407 F.2d 727 (7th Cir.1969). This procedure has been deemed necessary even though the trial court repeatedly admonished the jury, as here, regarding the reading of newspapers during the trial. See, e.g., United States v. Carter; United States v. Pomponio, 517 F.2d 460 (4th Cir.1975); United States v. Barrett, 505 F.2d 1091 (7th Cir.1975).
Robinson v. State, 438 So.2d 8, 9 (Fla.5th DCA) (footnote omitted), review denied, 438 So.2d 834 (Fla. 1983). Thus, it would appear that the judge should have examined the subject news article when defense counsel first called it to the court's attention. However, any error which may have occurred was cured when the jurors later acknowledged that they had read nothing about the trial in the newspapers.
Next Derrick claims that the trial court erred in restricting the defense's cross-examination of certain witnesses during the guilt phase of the trial. Some of the claims are without merit and need not be discussed. However, Derrick properly claims that the court should have allowed *36 him to impeach Lowry with an inconsistent statement from his deposition on the number of his prior convictions. Lowry testified that he had two felony convictions but defense counsel wanted to impeach him because he had answered "four, five, six, he didn't know" during his deposition. Ordinarily, witnesses are impeached on the number of prior convictions by the introduction of certified copies of records reflecting the convictions. Fulton v. State, 335 So.2d 280 (Fla. 1976). However, if the witness has previously testified on deposition to a greater number of convictions, he may be impeached by reference to the deposition. Notwithstanding, in view of all of the evidence of Derrick's guilt, this was clearly harmless error.
We also believe that the defense was unduly restricted in the cross-examination of Detective Vaughn. When Derrick's attorney initially asked Vaughn why he did not tape-record the confession, Vaughn answered that he found that tape recorders "sometimes inhibit the flow of conversation between the detective and a suspect." Derrick's attorney then tried to impeach Vaughn on his motives for not recording the testimony by asking, "Do you remember telling me in the hallway, you don't use the tape recorders because they're too easy to get the confessions thrown out?" The state's objection was improperly sustained. See State v. Powers, 555 So.2d 888 (Fla.2d DCA), review denied, 563 So.2d 633 (Fla. 1990). Derrick was entitled to try to cast doubt on the validity of Vaughn's testimony. However, this was also harmless error, particularly since several witnesses besides Vaughn testified about Derrick's confession.
Therefore, we affirm Derrick's conviction for first-degree murder.[5] However, due to error that occurred during the penalty phase, we vacate his sentence of death and remand for a new sentencing hearing.
During the penalty phase James was allowed to testify over objection that Derrick told James that he had killed Sharma and that he would kill again. Derrick claims that this testimony was irrelevant to the penalty phase and impermissibly showed lack of remorse and the possibility that Derrick would kill again. The state argues that this testimony was relevant to show that the murder was cold, calculated, and premeditated without any pretense of moral or legal justification. The state further argues that the testimony was not impermissibly used to show lack of remorse since the prosecutor never argued lack of remorse and the judge did not instruct the jury on lack of remorse as an aggravating factor.
We agree with Derrick that James's testimony was erroneously admitted and constitutes reversible error. The statement was not relevant to show Derrick's guilt because guilt is not at issue in the penalty phase of a trial. Therefore, the state must show that the statement is relevant to an issue properly considered in the penalty phase. We do not construe James's testimony to support the factor of cold, calculated, and premeditated without any pretense of moral or legal justification because all that Derrick admits in the statement is that he did kill Sharma. The statement makes no reference to a plan to kill Sharma, nor to a lack of justification for the murder. The testimony was not relevant to any other aggravating factor. See Pope v. State, 441 So.2d 1073, 1078 (Fla. 1983) ("[L]ack of remorse should have no place in the consideration of aggravating factors."). While the statement would be admissible to rebut evidence of remorse or rehabilitation, it was introduced before the defense presented any evidence. The statement was highly prejudicial because it suggests that Derrick will kill again.
Because we are remanding for a new sentencing hearing, we will only address one other issue from the penalty phase of the trial. The trial judge found that the murder was cold, calculated, and premeditated and that the murder was committed for the purpose of avoiding arrest. Under the facts as the judge found them, it appears to this Court that it is inconsistent to *37 find that both of these factors apply. In finding that the murder was committed to prevent lawful arrest, the judge relied on Derrick's confession that he had to kill Sharma after Sharma recognized him. Yet, the judge also found the murder to be cold, calculated, and premeditated because Derrick hid in the bushes with a knife waiting for Sharma and then chased Sharma twenty feet after the original attack to finish killing him. If Derrick did not decide to kill Sharma until Sharma recognized him, then it seems unlikely that the facts would support the finding of the heightened premeditation necessary to find the murder was cold, calculated, and premeditated. However, we note that the state may present new evidence on remand which supports these aggravating factors.
We decline to address any other issues raised as to the penalty phase. Therefore, we affirm Derrick's conviction but vacate his death sentence and remand for a new sentencing hearing before a jury.
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD, BARKETT, GRIMES and KOGAN, JJ., concur.
NOTES
[1] Defense attorney Dehnart was representing both Derrick and James.
[2] Derrick's counsel expressed concern over James's agreeing to waive his attorney-client privilege without the benefit of conferring with new counsel.
[3] § 921.141(5)(d), (e), (h) & (i), Fla. Stat. (1987).
[4] Until James testified, there was no basis upon which it could be said that Derrick was unfairly prejudiced by the late notice of James as a potential witness.
[5] We also reject Derrick's claim concerning the prosecutor's closing argument.