983 So.2d 443 (2008)
Samuel Jason DERRICK, Appellant,
v.
STATE of Florida, Appellee.
Samuel Jason Derrick, Petitioner,
v.
Walter A. McNeil, etc., Respondent.
Nos. SC05-1559, SC06-1380.
Supreme Court of Florida.
February 7, 2008.
As Modified on Denial of Rehearing May 29, 2008.
*447 Harry P. Brody and Jeffrey M. Hazen of Brody and Hazen, P.A., Tallahassee, Florida, for Appellant/Petitioner.
Bill McCollum, Attorney General, Tallahassee, Florida, and Katherine V. Blanco, Assistant Attorney General, Tampa, Florida, for Appellee/Respondent.
PER CURIAM.
Samuel Jason Derrick was convicted of first-degree murder and sentenced to death for the 1987 killing of Rama Sharma. In this postconviction proceeding, he appeals an order of the circuit court denying his motion to vacate his conviction and sentence filed under Florida Rule of Criminal Procedure 3.850 and petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For all the reasons set forth below, we affirm the trial court's denial of postconviction relief and deny the petition for a writ of habeas corpus.

FACTS AND PROCEDURAL HISTORY
The pertinent facts of this case were set forth in this Court's opinion on direct appeal as follows:
On June 25, 1987, at 6:30 a.m., Harry Lee found the body of Rama Sharma in a path in the woods near Sharma's Moon Lake General Store in Pasco County. Blood trailed from the body to a blood puddle twenty feet away. The police found a piece of a tee shirt near the body as well as two sets of tennis shoe prints, one set belonging to Harry Lee. The medical examiner found that Sharma had died from over thirty-one stab wounds and that he had died approximately ten to fifteen minutes after the last wound was inflicted. Derrick was implicated in the murder by his friend, David Lowry. At trial Lowry testified that he and his wife visited Derrick on June 24 at Derrick's mother's house and that Derrick had knives out. Lowry drove Derrick to another friend's house, at which time Lowry noticed that Derrick had a knife in the back of his pants. At the time, Derrick was wearing a tee shirt, jeans, and tennis shoes. The friend's house was about two blocks from Sharma's store. At approximately 1:30 a.m. on June 25, Derrick showed up at Lowry's house in a sweaty condition and without a shirt. When Lowry drove Derrick home, Derrick told him that he had robbed the Moon Lake General Store. Derrick gave Lowry twenty dollars for gas. Later that day, after Lowry heard that Sharma had been killed, he asked Derrick whether he had killed him. Derrick admitted killing Sharma, stating that he had stabbed him thirteen times because Sharma kept screaming. Lowry testified that Derrick "kind of laughed and said it was easy." Lowry also noted that on June 25 Derrick had a new car that was worth approximately $200-$300. On June 29, Lowry notified the sheriff's department about Derrick's involvement in the murder.
After being arrested and advised of his rights, Derrick denied any knowledge of the murder to Detective Vaughn. Vaughn then advised Derrick that they had a witness, David Lowry. After denying that Lowry had told them anything, Derrick demanded, "I'd like to have him in front of me. Let him tell me." Vaughn then brought Lowry and Derrick into the same room and Derrick *448 confessed to the murder. He stated that he went to Sharma's store to rob it and jumped Sharma as he left the store. Sharma turned to run back to the store. When Derrick grabbed him, Sharma turned around and saw that it was Derrick. Sharma started screaming and Derrick stabbed him "to shut him up." Derrick then took approximately $360 from Sharma's pocket. Derrick also admitted that he tore off a piece of his tee shirt at the scene because it had blood on it. After the murder, Derrick threw the knife into the woods and ran to Lowry's house. Derrick also stated that he lost the money and that he threw his shoes and some clothing into a pond. The police took Derrick to the Moon Lake General Store, and he showed them where he had attacked and murdered Sharma. The police never located the clothing, shoes, or knife.
Derrick v. State, 581 So.2d 31, 33 (Fla. 1991). The jury found Derrick guilty of first-degree murder. During the penalty phase, Derrick presented witnesses who testified that he was a good husband, father, and human being and that he had suffered physical and sexual abuse as a child. The jury recommended death by an eight-to-four vote. In following the jury's recommendation and sentencing Derrick to death, the judge found four aggravators[1] but only one statutory mitigating circumstancethe defendant was twenty years old at the time of the murder. The judge did not find any nonstatutory mitigating circumstances. See id. at 34.
On direct appeal, Derrick raised nine issues.[2] This Court affirmed the conviction for first-degree murder. However, the Court reversed Derrick's death sentence based on its conclusion that the testimony offered by the State during the penalty phase from Randall James, a jailhouse informant, was impermissible and prejudicial because it suggested Derrick would kill again. The Court affirmed on all other guilt-phase issues and discussed one other penalty-phase issue,[3] but declined to address any other issues concerning the penalty phase. See id. at 36-37.
At the second sentencing hearing, Derrick presented several witnesses who testified as to his positive traits and helpful nature. Unlike the first penalty phase, there was no evidence presented of Derrick's terrible childhood or the circumstances of his sexual abuse. The jury recommended the death penalty by a seven-to-five *449 vote. The trial judge again found substantial aggravation, specifically that the murder was committed during the commission of a robbery, the murder was committed to avoid or prevent a lawful arrest, and the murder was especially heinous, atrocious, or cruel. Unlike the first sentencing, the trial court did not find the CCP aggravator applicable. As to mitigation, the trial court once again found the statutory mitigator of age and, in addition, found the nonstatutory mitigating circumstance of potential for rehabilitation as follows:
[T]he defendant has met the standard of "reasonable certainty" in establishing that the defendant has some potential for rehabilitation. Although the defendant has only recently been given an opportunity to assist other inmates in their efforts to become literate, the defendant's past assistance of his learning handicapped brother combined with the testimony of Nanci Denamen from the Scwettman Adult Education Center, tends to indicate that the defendant actually is well motivated in this regard and is not simply taking advantage of an opportunity to make himself look somewhat better to the sentencing jury and the Court.
However, finding that the aggravating factors outweighed the mitigating factors, the trial court followed the jury's recommendation and sentenced Derrick to death.
On his direct appeal after resentencing, Derrick raised seven claims all related to the penalty phase.[4] This Court, finding that each issue raised was without merit, affirmed the sentence of death. The postconviction process then began with the initial filing of a "shell" rule 3.850 motion in 1997, Derrick's first amended motion for postconviction relief in 1998, and his second amended motion in December 2001. Six claims were raised and the trial court summarily denied all of the claims except for counsel's failure to present mitigating evidence at the second penalty-phase proceeding, Derrick's subclaim that counsel failed to present evidence of other suspects, and Derrick's cumulative error claim.[5] Following an evidentiary hearing, the trial court issued a detailed order denying relief and Derrick now appeals.

ANALYSIS

A. MOTION FOR POSTCONVICTION RELIEF
Following the United States Supreme Court's decision in Strickland v. Washington, *450 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied: first, the defendant must establish that counsel's performance was deficient; second, the defendant must establish that counsel's deficient performance prejudiced the defendant. See Carratelli v. State, 961 So.2d 312, 320 (Fla. 2007) (quoting Strickland, 466 U.S. at 687, 104 S.Ct. 2052); Mendoza v. State, 964 So.2d 121, 127 (Fla.2007); Philmore v. State, 937 So.2d 578, 583 (Fla.2006).
To establish the deficiency prong under Strickland, the defendant must prove that counsel's performance was unreasonable under "prevailing professional norms." Morris v. State, 931 So.2d 821, 828 (Fla.2006) (quoting Strickland, 466 U.S. at 688, 104 S.Ct. 2052). To establish the prejudice prong under Strickland, the defendant must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052).
Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004).
1. SUMMARY DENIAL OF GUILTPHASE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS
We begin with the issue of whether the trial court erred in summarily denying Derrick's ineffective assistance of counsel claims arising from the guilt phase. Generally, a defendant in a rule 3.850 motion filed in a capital case is entitled to an evidentiary hearing unless: "(1) the motion, files, and records in the case conclusively show that the [defendant] is entitled to no relief, or (2) the motion or a particular claim is legally insufficient." Freeman v. State, 761 So.2d 1055, 1061 (Fla.2000); accord Fla. R.Crim. P. 3.850(d).[6] In such a case, "[t]he defendant bears the burden of establishing a prima facie case based upon a legally valid claim. Mere conclusory allegations are not sufficient to meet this burden." Freeman, 761 So.2d at 1061. However, when reviewing a court's summary denial of an initial rule 3.850 motion filed in a capital case, the Court will affirm the ruling only if the State has shown that the motion is legally flawed or that the record conclusively demonstrates that the defendant is entitled to no relief. See Patton v. State, 784 So.2d 380, 386 (Fla.2000). This Court must accept Derrick's allegations as true "to the extent they are not refuted by the record." Peede v. State, 748 So.2d 253, 257 (Fla. 1999).
a. Ineffective Assistance of Counsel Regarding Derrick's Confession
In his first claim, Derrick contends that trial counsel was ineffective for failing to *451 challenge the evidence presented at his suppression hearing by: (1) failing to call lay and expert witnesses, such as a "confessionologist"; and (2) failing to impeach the State's witness. In sum, Derrick asserts that his alleged confession to Detective Vaughn was given under police coercion and that the techniques used during questioning could lead to false confessions. The trial court denied an evidentiary hearing on this claim because Derrick failed to establish a basis for suppression of the confession.
As to the failure to call a "confessionologist," Derrick specifically claims that a "confessionologist" would have testified that the techniques used during Derrick's confession could lead to false confessions; thus, the confession should be suppressed.[7] We rejected a similar claim in Bryant v. State, 901 So.2d 810 (Fla.2005). There, Bryant claimed that trial counsel provided ineffective assistance by failing to obtain a false confession expert. Id. at 821. Bryant neither provided proposed testimony nor claimed to have retained a confession expert. Id. Instead, Bryant concluded that an expert could testify that "[Bryant's] confession is typical of those which are false." Id. at 821-22 (alteration in original). This Court held that such a claim was legally insufficient. Id. at 822. Likewise, Derrick's claims that trial counsel rendered ineffective assistance by failing to present testimonial evidence from the "confessionologist" are legally insufficient. We reject the claim as we did in Bryant because Derrick does not provide specific factual allegations regarding the "confessionologist's" testimony. In making this determination, we also deem it important that Derrick does not allege that his confession to Detective Vaughn was actually false.[8]
Derrick also asserts that trial counsel was ineffective at the suppression hearing for failing to impeach the State's witness by: (1) failing to present evidence that Derrick did not waive his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); (2) failing to challenge the inconsistencies in Detective Vaughn's testimony; and (3) failing to cross-examine Vaughn about his interrogation techniques. As to this ineffective assistance claim, Derrick first asserts that he never waived his Miranda rights; therefore, any statements made to Detective Vaughn should have been suppressed. Derrick emphasizes that he never signed the Statement of and Waiver of Miranda Rights. However, an unsigned waiver form does not necessarily equate to a failure to waive Miranda rights. See Sliney v. State, 699 So.2d 662, 668 (Fla. 1997) (holding that the failure to sign a Miranda form in full does not necessarily invalidate the waiver). Here, Detective Vaughn testified that Derrick was read his Miranda rights, a fact Derrick does not dispute. Further, in response to the question of whether he understood his rights, Derrick replied in the affirmative and stated that he would talk to the officers.
Second, Derrick asserts that trial counsel was ineffective for failing to challenge the inconsistencies in Detective *452 Vaughn's testimony. In summarily denying this aspect of Derrick's claim, the trial court found that the inconsistencies between witness statements would not have led to suppression of Derrick's confession. Derrick has not identified any significant disparities between statements and we conclude independently that none of the identified inconsistencies would have led to the suppression of the confession as either coerced or involuntary. Third, as to the adequacy of the cross-examination of Detective Vaughn, we agree with the trial court that any cross-examination of Detective Vaughn would go to credibility and not admissibility.[9]
We agree with the summary denial because, even assuming counsel had taken the steps proposed by Derrick, there was no legally cognizable basis to suppress Derrick's confession and hence no prejudice. Without an allegation of falsity in this case, any proposed testimony offered by the "confessionologist" would not have affected the trial court's ultimate decision as to the admissibility of the confession. There is nothing about the circumstances of Derrick's confession that suggest it was coerced, involuntary or otherwise inadmissible, especially in light of the testimony of David Lowry, to whom Derrick initially confessed.[10] In short, we conclude that no prejudice has been established as a matter of law, based on the record in this case, and nothing that Derrick has alleged would alter the conclusion that the confession was voluntary and admissible. Accordingly, this claim is conclusively refuted by the record.
b. Ineffective Assistance Regarding Jailhouse Informant Randall James
The next guilt-phase issue of ineffective assistance of counsel concerns trial counsel's handling of the proposed testimony of jailhouse informant Randall James. The background facts pertinent to this issue are set forth in our opinion on Derrick's first direct appeal:
After the defense had presented two witnesses, they announced that they were calling Derrick to testify. At this point, the prosecutor announced that if Derrick testified that he had not committed the murder, he planned to call in rebuttal an inmate named Randall James. The prosecutor said that, after the first defense witness began to testify, he had received a note informing him that Detective Vaughn had just been told by James that Derrick told James that he had killed Sharma and that he would kill again. The prosecutor offered to make James available for a deposition.
Derrick's attorneys, who were public defenders, requested a recess to determine what to do because their office also represented James and they were therefore concerned about the implications of cross-examining James. The prosecutor *453 indicated that it was his understanding that James was willing to waive the attorney-client privilege. After the recess, the judge removed the public defender's office from representing James in an effort to alleviate the conflict. Continuing to express concern over the dual representation, Derrick's attorneys made a motion for mistrial which was denied. They then decided to rest without calling Derrick as a witness. The jury found Derrick guilty. Derrick's attorneys took James's deposition while the jury was deliberating.
Derrick, 581 So.2d at 33-34 (footnotes omitted).
As to the specifics of James's testimony, the State alleged that James would testify to the following conversation, in which James asked the defendant, "What are you in here for?" Derrick said, "Murder" to which James allegedly asked him, "Did you do it?" The State further alleged that Derrick responded, "Yeah, I killed the motherfucker and I may kill again." Based on that representation by the State, trial counsel made a decision not to call Derrick, thereby avoiding this potentially devastating testimony in the guilt phase. Trial counsel ultimately deposed James before the penalty phase and discovered that James had a history of mental illness and was moved to the psychiatric ward after the alleged conversation with Derrick. Derrick cites a number of reasons for counsel's ineffectiveness as to this issue, including: the failure of trial counsel to depose James until after the conclusion of the guilt phase; an allegation that the jury overheard the substance of James's proposed testimony; and an alleged conflict of interest because Derrick's attorney from the Public Defender's Office was also representing James in a separate matter.
To put this issue in proper context, it is important to stress that James never testified at the guilt phase because trial counsel decided not to call his client to testify when faced with his damaging testimony. Further, Derrick never alleges what he would have testified to if called to the stand and, given his confession, it is difficult to understand how his testimony would have been helpful to his defense.
Moreover, this Court previously reviewed trial counsel's conduct in dealing with James's rebuttal testimony on direct appeal. In fact, we rejected the claim that the trial court failed to conduct a proper Richardson inquiry after the State revealed James as a potential witness. Derrick, 581 So.2d at 34. In rejecting the claim, this Court stated that trial counsel "made a tactical decision to rely upon the prosecutor's representations of what James's testimony would be and advised Derrick not to testify." Id. at 35. By finding that this issue had previously been considered on direct appeal, the lower court correctly held that Derrick's claim should be denied. In essence, Derrick's claim is procedurally barred because it "is merely a variant of the issues raised on direct appeal." Jones v. State, 949 So.2d 1021, 1033 (Fla.2006).
Even assuming that trial counsel's failure to depose James rather than rely on the prosecutor's representations could be considered unreasonable, there is no basis to conclude that the failure to call Derrick in light of James's extremely damaging testimony was an unreasonable strategy. Although it is true that counsel could have deposed James and obtained potentially valuable impeachment evidence regarding his mental illness, impeachment alone would not have eliminated the damage that could have resulted from James's proposed testimony that Derrick admitted: "Yeah, I killed the motherfucker and I may kill again." To the contrary, if trial counsel had called Derrick to testify and *454 thus opened the door for James's damaging testimony, Derrick might well have had a valid claim that it was unreasonable strategy to allow him to testify.
Further, we conclude as a matter of law that prejudice has not been established, i.e., our confidence in the outcome of the guilt phase has not been undermined. Had James testified in the guilt phase, such statements would only have added to the existing incriminating evidence against Derrick, including Lowry's testimony that Derrick admitted to the murder and Derrick's own confession. Importantly, none of the alleged claims of ineffectiveness would affect the admissibility of James's testimony, only the ability to impeach James if he had testified. Further, as stated previously, Derrick fails to allege in his postconviction motion what he would have testified to had he taken the stand in his own defense. In short, Derrick has failed to establish a basis for either deficiency or prejudice. Therefore, summary denial was proper because the record conclusively shows that Derrick is entitled to no relief.
As to Derrick's assertion that the substance of James's testimony was announced in open court, the record affirmatively indicates that the jury was removed from the courtroom before any discussion of James's testimony took place. Derrick has not alleged any facts that would refute the record, showing that the jury was in the courtroom when James's testimony was discussed or that the jury overheard that testimony. Further, considering the overwhelming evidence of guilt, including Derrick's own confession, prejudice has not been established as a result of these alleged deficiencies in not deposing James in the guilt phase.
Lastly, as to Derrick's claim that James's proposed testimony should have been excluded from the guilt phase because he and Derrick were represented by the same counsel, this claim should have been raised on direct appeal and is therefore procedurally barred. See Thompson v. State, 759 So.2d 650, 661 (Fla.2000) (supporting trial court's finding that conflict of interest claim should have been raised on direct appeal and was procedurally barred because the facts that formed the basis of the claim were known to the defendant at the time of the direct appeal). However, because the right to effective assistance of counsel encompasses the right to conflict-free counsel, Hunter v. State, 817 So.2d 786, 791 (Fla.2002), we also examine this claim on the merits.
In a motion for postconviction relief, a defendant must establish both that there was an actual conflict of interest and that the conflict adversely affected counsel's performance. See id.; Quince v. State, 732 So.2d 1059, 1065 (Fla.1999). However, in this case, once the trial court removed counsel from representing James, any actual conflict of interest was eliminated. Further, even assuming an actual conflict existed, the defendant must also allege how the conflict adversely affected counsel's performance. See Hunter, 817 So.2d at 791. As to this prong, Derrick alleges that counsel's faulty advice not to testify arose from a conflict of interest. However, we reject as a matter of law the claim that a conflict of interest adversely affected counsel's performance for the same reasons we previously discussed in concluding that no prejudice could have resulted from the failure to depose James earlier. In short, even if counsel had advised Derrick to testify, James's rebuttal testimony would have been extremely damaging to Derrick's defense and there has been no allegation of how Derrick's proposed testimony would have in fact assisted his defense.
*455 We likewise reject Derrick's claim that the State's notice regarding the proposed guilt-phase testimony of Randall James amounted to prosecutorial misconduct in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). First, on direct appeal, we rejected that there was a Richardson violation in the trial court's treatment of Randall James's proposed testimony. See Derrick, 581 So.2d at 35 ("We have never before held that a defendant was prejudiced by the late listing of a witness who never testifies at trial, and we decline to do so now."). Second, there cannot be a Giglio violation, which involves the knowing presentation of false testimony, because James never testified. Third, for the same reasons that we concluded that Derrick has not suffered prejudice from the proposed testimony of Randall James, Derrick has not established materiality under Brady. See United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (expressly applying the Strickland standard of "reasonable probability" to Brady cases); Cardona v. State, 826 So.2d 968, 973 (Fla. 2002). Because of the foregoing, the trial court was correct in finding that this claim did not warrant an evidentiary hearing and we affirm the denial.
c. Ineffective Assistance Regarding Knife and Blood Evidence
Derrick's final allegations of error regarding the guilt-phase ineffective assistance claims that were summarily denied involve the following: trial counsel's failure to object to the State's closing argument about the type of knife that was used on the victim; the failure of trial counsel to object to the testimony of State witnesses Calhoun and Page; and trial counsel's failure to attack blood evidence found at the crime scene.
As to the first aspect of this claim, the State argued in its closing argument that the medical examiner, whom the State called as a witness, "made a mistake" in determining that the murder weapon was a single-edged blade because the photos of the victim's wounds plainly showed that the blade used was double-edged. In summarily denying this claim, the trial court found the closing arguments proper, stating that Derrick was seen with both single and double-edged knives and admitted to using a double-edged knife during the murder. We agree that there was nothing improper about this closing argument for the same reasons; accordingly, the trial court did not err in summarily denying the claim that trial counsel was deficient in failing to object. See Mungin v. State, 932 So.2d 986, 997 (Fla.2006) (finding that the prosecutor's statements were proper and therefore ineffective assistance of counsel for failing to object could not be established).
As to the claim of failure to object to the admissibility of the testimony of State witnesses Calhoun and Page regarding blood splatter evidence, neither witness's testimony amounted to expert opinion. Both witnesses were crime scene technicians and testified as to their observations, such as the location and position of the body and its distance from a trail of blood found on a pathway. Because trial counsel cannot be held ineffective for failing to object to properly admissible testimony, see id., summary denial of this claim was also proper.
Finally, Derrick alleges that counsel was ineffective for failing to hire an expert to examine a bloody T-shirt found at the crime scene and analyze actual blood evidence and the videotape of the crime scene. The trial court found that it was unnecessary for counsel to obtain an independent *456 analysis of the blood evidence because there was no suggestion that the blood did not belong to the victim or that anyone else bled in the vicinity of the crime scene. Further, Derrick did not allege how an independent analysis of the videotape or bloody T-shirt would demonstrate prejudice. We agree with the trial court that the allegations do not provide a basis for a finding of deficiency or prejudice. However, we note that subsequent to his rule 3.850 motion, Derrick filed in the trial court a motion for postconviction DNA testing pursuant to Florida Rule of Criminal Procedure Rule 3.853. The State did not oppose the motion and the trial court granted the testing. The items to be tested include the bloody shirt, but also include a partially eaten hot dog, a sample from a blood drop found under a nearby picnic table, and fingernail scrapings from the victim. Accordingly, although we affirm the summary denial of the claim of ineffective assistance of counsel relating to the blood evidence and videotape, we do so without prejudice to consideration of the separate DNA proceedings in the trial court.
2. INEFFECTIVE ASSISTANCE OF PENALTY-PHASE COUNSEL
We now turn to the claims of ineffective assistance of penalty-phase counsel, which were denied by the trial court after an evidentiary hearing. Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo. See Sochor, 883 So.2d at 771-72; see also Reed v. State, 875 So.2d 415, 421-22 (Fla.2004) ("[T]his Court's standard of review is two-pronged: (1) this Court must defer to the circuit court's findings on factual issues so long as competent, substantial evidence supports them; but (2) must review de novo ultimate conclusions on the deficiency and prejudice prongs.") (citing Stephens v. State, 748 So.2d 1028, 1033 (Fla.1999)). Derrick alleges that resentencing counsel failed to investigate and present a significant amount of mitigating evidence to the jury, including the failure to present lay witnesses to testify concerning the deprivations in Derrick's early life and the sexual abuse he endured as a child. Derrick also asserts that counsel was ineffective by failing to present a mental health expert to testify to statutory and nonstatutory mitigation. To put this claim into its proper context, we will review the testimony presented at the initial penalty phase, at the resentencing, and at the evidentiary hearing on Derrick's motion for postconviction relief.
During the initial penalty phase of Derrick's trial, defense counsel presented the testimony of a total of five witnesses, including three family members, who testified that Derrick was a good husband, father, and person and that he had suffered physical and sexual abuse as a child. Derrick, 581 So.2d at 34. Although Derrick received a psychological evaluation, counsel did not present any mental health testimony. As to the childhood sexual abuse, defense counsel only presented the testimony of one witness, Harry Martin, the foster parent who had committed the abuse. Notwithstanding all of this testimony, the trial court found only Derrick's age as a statutory mitigator and found no other nonstatutory mitigating circumstances applicable, including Derrick's abusive childhood. The jury recommended death by a vote of eight to four and the trial court followed the recommendation.
At resentencing, newly appointed defense counsel presented the testimony of eight witnesses, including two family members, *457 who each testified as to Derrick's positive traits.[11] Similar to the initial penalty phase, counsel did not present any mental health mitigation. Cherie, Derrick's wife at the time of the crime who also was a witness at the initial penalty phase, testified that Derrick was a good husband. Travis Derrick, Derrick's older brother, testified about growing up with Derrick and about his positive qualities. Defense counsel focused on Derrick's positive attributes and good nature but did not, however, present any testimony regarding the childhood conditions or abuse suffered by Derrick. Although counsel presented the testimony of family members who could have testified regarding the physical and sexual abuse, specifically his brother Travis, defense counsel did not ask questions of any of these witnesses regarding the abuse. Based on the evidence presented, the trial court found
that Derrick was "quite young" at the time of the killing and that Derrick has some potential for rehabilitation. The court also found that Derrick had helped illiterate inmates in prison and had helped his handicapped brother.
Derrick, 641 So.2d at 379 (footnote omitted). The jury recommended death by a vote of seven to five and the trial court followed that recommendation.
At the evidentiary hearing, Derrick presented the testimony of several witnesses, including family members and a mental health expert, to support his ineffective assistance of counsel claim arising from resentencing; specifically, defense counsel's failure to present evidence of Derrick's impoverished childhood and sexual abuse and failure to present a mental health expert. Carolyn Haney, Derrick's sister, testified about their poor upbringing, their mother's drug use and Derrick's role as her protector. Travis Derrick testified regarding the sexual abuse he and his brother suffered at the hands of their foster parent and about Derrick's willingness to help Travis with his schoolwork. Cherie Derrick also testified regarding Derrick's loving and kind nature. Additionally, other family members testified at the evidentiary hearing, including: Samuel Derrick, Derrick's younger brother, who testified that Derrick once saved him from drowning; and Victoria Marion, Derrick's mother, who found out from another adult that her sons were being sexually molested by Martin.
Dr. Henry Dee, who completed neuropsychological testing and an evaluation of Derrick in 2001, testified that Derrick had impaired memory functioning and impaired frontal lobe functioning, which is associated with difficulty in inhibiting one's responses. He testified that these impairments indicated that Derrick was "suffering a major mental disturbance that is brain damage with mixed features." However, Dr. Dee could not establish what caused the impairments or when the impairments began. Although he learned from family members of an abusive childhood, he testified that the sexual abuse would have had no effect on Derrick's mental impairment. His school records did not reveal any significant educational problems and there was no history of mental health treatment. As for the statutory mental health mitigators, Dr. Dee testified that Derrick "would have difficulty in conforming his conduct to the dictates of the law because of the extreme impulsivity that [he sees] in patients with this type of brain damage," but did not explain how the *458 brain damage he diagnosed specifically affected the crime in question.
Robin Kester, one of the two defense attorneys at resentencing, testified as to her review of the record in the case, including the initial penalty phase and the testimony presented therein, and her reasons for not presenting evidence of Derrick's abuse and mental health mitigation to the jury. In rebuttal, the State presented the testimony of Robert McClure, counsel from Derrick's initial trial. McClure testified as to his preparation for the initial penalty phase, including the fact that he interviewed Derrick's mother and that his notes indicated he spoke with Derrick's sister, but decided to use only Derrick's father at the first penalty phase.
Regarding the failure to put on mitigation about his childhood, the trial court acknowledged the deplorable circumstances of Derrick's childhood in its detailed order denying this claim, as portrayed through the testimony at the evidentiary hearing. This included the uncontradicted testimony of sexual abuse. However, the trial court ultimately rejected this claim. The trial court essentially determined that trial counsel made a reasonable strategic decision, with input from Derrick, to forego any focus on his neglected childhood and childhood sexual abuse, and pursue a strategy to "go positive." The trial court concluded that counsel's strategy was reasonable, stating in pertinent part:
The result of the first penalty phase was a jury recommendation for death, by a vote of 8 to 4.
Apparently as a result of the perceived failure of the tactics utilized in the first penalty phase in this case, the defendant decided that those tactics should be abandoned in the second penalty phase and instructed counsel in the second penalty phase to "go positive" during the second penalty phase. In short, the defendant wished to abandon the tactic of attempting to demonstrate that he should be spared a death recommendation due to the deplorable circumstances of his upbringing, including his victimization by a pedophile. This would appear to be a reasonable course of conduct based upon the disappointing results achieved in the first penalty phase. . . . Although the second penalty phase jury ultimately recommended death, the final vote improved to 7 to 5 and the jury nearly recommended life by a vote of 6 to 6.
. . . .
The defendant's attorneys in the second penalty phase proceeding were well aware of the attempts made by the defendant's attorneys in the first penalty proceeding to develop mental health evidence to assist the defendant. The evidence presented to the court demonstrates that these efforts failed and, although they were not repeated by the attorneys in the second penalty phase proceeding, there appears to have been no reason to expect that further efforts along the lines would have any better chance of succeeding.
(Citation omitted.)
Derrick's claim must be analyzed in light of the fact that this was a resentencing and that his counsel, in preparing for the second penalty phase, had the advantage of analyzing the first penalty phase, which resulted in a sentence of death. See Henry v. State, 862 So.2d 679, 685 (Fla.2003) ("Retrial counsel . . . testified that when he undertook Henry's representation, he obtained and familiarized himself with all the files from the previous trial, including the mental health examinations, reports, depositions, and trial transcripts."). In other words, this is not a case involving the failure of counsel to *459 discover mitigation but rather a case involving trial counsel's strategic decision not to present certain mitigation after having had the opportunity to review the initial penalty phase and the first jury's death recommendation. Thus, we distinguish this case from our other decisions where we held counsel to be ineffective for failing to investigate and discover mitigating evidence. See Rose v. State, 675 So.2d 567, 572 (Fla.1996) (noting that counsel did not obtain records which contained information about defendant's mental problems); Hildwin v. Dugger, 654 So.2d 107, 109 (Fla.1995) (stating that counsel was unaware of defendant's psychiatric hospitalizations and suicide attempts).
Attorney Kester testified that she had the advantage of watching the guilt phase and reviewing the case files from the Public Defender's office. She was aware that the first jury heard information about the details of Derricks childhood and had recommended the death penalty; therefore, she considered other options. In this regard, we again note that at the initial trial, counsel presented evidence of Derrick's childhood sexual abuse through the testimony of the abuser, Harry Martin. The State recognized the molestation but argued that it was not traumatic for Derrick because he continued to be associated with Martin after Martin was released from prison. The trial court did not find this abuse to be a mitigating factor.[12] Although the childhood sexual abuse was undoubtedly traumatic, there was no evidence established at the initial trial or the evidentiary hearing as to how it affected Derrick as he became a young adult. Therefore, Kester's decision not to pursue this line of mitigation and to adopt a different strategy could be considered reasonable. Arguably, it might have been deemed unreasonable to pursue the same strategy with the awareness that such tactics were unsuccessful the first time they were used. Cf. Henry, 862 So.2d at 686 ("[R]etrial counsel had the advantage of knowing that the strategy Henry proposes failed at the first trial, where despite the mental health mitigation testimony of the two defense experts, the trial court found no mitigation, and the jury . . . recommended death.").
Nevertheless, we emphasize that the failure to obtain a life recommendation in an initial penalty-phase proceeding should not be the sole factor in counsel's decision not to present the same mitigating evidence at a resentencing. Our focus is on "whether counsel's decision not to present such evidence was a reasonably informed, professional judgment." Id. at 685 (citing Wiggins v. Smith, 539 U.S. 510, 522-23, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)). Here, Kester's decision was not made out of ignorance. While Derrick asserts that Kester's "deficiency is also rooted in her failure to investigate," counsel was indeed aware of the abuse Derrick suffered and his poor living conditions, but selected another approach she considered viable.
First, although Kester did not reinterview witnesses from the first penalty phase, she performed additional investigation. She then used two original penalty-phase witnesses and several new witnesses to support her "go positive" strategy, speaking to each one before they testified at the resentencing. In fact, as previously mentioned, Kester presented the testimony of eight witnesses, including two family members, who testified as to Derrick's helpful nature; in effect, each portrayed Derrick in a positive light. Moreover, not only did Kester review the case files from the initial trial, she also testified that she *460 conferred with co-counsel about the presentation of the sexual abuse.
Second, the testimony adduced at the evidentiary hearing supports the conclusion that Kester conducted a reasonable investigation, decided to adopt a strategy that focused on Derrick's positive traits as opposed to the abuse he suffered, and introduced testimony at resentencing in accordance with that strategy. Out of the eight witnesses presented by the defense at the evidentiary hearing, only three could have specifically testified regarding Derrick's abusive childhoodCarolyn, Victoria and Travis.
As to Carolyn, Kester testified at the evidentiary hearing that she did not know if she would have wanted Carolyn as a witness because there had been a juvenile criminal case alleging that Derrick committed a lewd and lascivious act upon her. Presenting Carolyn's testimony would have risked exposing the jury to this damaging testimony.
As to Travis, Kester presented Travis as a witness at resentencing to testify about Derrick's positive traits and specifically chose not to question Travis about the childhood abuse in accordance with her strategy. Notably, Travis testified at the evidentiary hearing and recalled his conversation with the Public Defender's office about the focus of his proposed testimony. The following exchange took place:
Mr. Rosario [assistant state attorney]: Do you recall speaking with the Public Defender's office and that he got a new sentencing phase and that he wanted to go positive at that second sentencing phase?
Travis Derrick: Yes.
Mr. Rosario: And they spoke to you about because he wanted to go positive, it was his decision to go positive, that they wanted you to bring out the good things that he had done in his life.
Travis Derrick: Yes.
This colloquy further indicates that Kester was consciously following the strategy to "go positive."
In addition to her own investigation and preparation, Kester also took into consideration Derrick's request that counsel not present any evidence of his bad home life. Although we reiterate that counsel is obligated to conduct a reasonable investigation even where a defendant requests that mitigation be waived, see State v. Lewis, 838 So.2d 1102, 1113 (Fla. 2002), a defendant's wishes can be a valid consideration in deciding on an appropriate trial strategy. See Strickland, 466 U.S. at 691, 104 S.Ct. 2052 ("Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant."). Here, Kester testified: "I didn't let Jason [Derrick] run the show. . . . I'm the attorney, and clients don't run the show. But . . . I didn't think it was necessarily at the time a bad strategy." For all these reasons, we agree with the trial court that counsels decision not to present evidence of Derric's childhood abuse and to adopt a different strategy at resentencing was reasonable.
After conducting a reasonable investigation into Derrick's early life and the original trial, and considering the prior death recommendation, counsel followeddeath recommendation, counsel followed Derrick's proposed approach and made a strategic decision to focus on the positive attributes of Derrick's life. See Rutherford v. State, 727 So.2d 216, 223 (Fla.1998) (trial court's finding that counsel made a strategic decision to "humanize" the defendant and present mental mitigation to the judge but not the jury was not erroneous); see also Miller v. State, 926 So.2d 1243, 1250 (Fla.2006) (finding counsel conducted a reasonable investigation as evidenced by *461 counsel's awareness of the defendant's childhood, substance abuse and mental health issues and counsel's research into the work and research of former defense counsel). "[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000).
In conjunction with his claim of ineffective assistance of counsel in the penalty phase, Derrick also asserts that his counsel was ineffective for not presenting mental health testimony. Although a psychological evaluation was initially obtained before the first penalty phase, mental health evidence was not presented at the first penalty phase. Resentencing counsel reviewed Dr. Nancy Simons' report of Derrick's psychological evaluation, in which he was diagnosed with antisocial personality disorder, and felt it was more harmful than helpful because it conflicted with testimony of Derrick's kind nature. See Burns v. State, 944 So.2d 234, 243-44 (Fla.2006) (no error in trial court's finding that mental mitigation would have contradicted lay witness testimony of defendant's "role model" traits). Furthermore, "this Court has acknowledged in the past that antisocial personality disorder is a trait most jurors tend to look disfavorably upon.'" Reed, 875 So.2d at 437 (quoting Freeman v. State, 852 So.2d 216, 224 (Fla. 2003)).
Dr. Simons also stated in her report that if Derrick had committed the murder of Rama Sharma, "he would not have been suffering from a mental disease or defect and did have the cognitive ability to socially and morally understand the concept of right and wrong." At the evidentiary hearing, another mental health expert, Dr. Dee, stated that Derrick's performance on the frontal lobe functioning test indicated that he has difficulty inhibiting responses and acts without sufficient thought or deliberation. Although the purpose of Dr. Dee's testimony was to establish mental health mitigation, counsel's reasonable mental health mitigation investigation "is not rendered incompetent merely because the defendant has now secured the testimony of a more favorable mental health expert." Asay v. State, 769 So.2d 974, 986 (Fla.2000). Accordingly, Derrick has not established that counsel's decision not to further pursue mental health mitigation was unreasonable under the circumstances of this case.
We also conclude, based on the totality of the circumstances of this case, that counsel's performance at the resentencing was not deficient under Strickland. Because Derrick has failed to establish counsel's deficient performance, it is not necessary for this Court to examine Derrick's claim of prejudice. Nevertheless, we consider whether prejudice has been established by any alleged deficiencies.
In this case, there were strong aggravating factors. Specifically, the resentencing trial court found that: (1) the murder was committed during the commission of a robbery; (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest; and (3) the murder was especially heinous, atrocious or cruel. This was a murder of a defenseless man who was killed after being robbed. The killing was brutal and Derrick bragged about it to his friend after the robbery. Even if counsel had offered evidence of Derrick's childhood conditions, sexual abuse, and mental health testimony, it would have been quite difficult to overcome the strong aggravation. Further, even though Dr. Dee's testimony could have established some mental mitigation, it was not particularly compelling. As previously *462 mentioned, he testified only that the brain damage, diagnosed by him through neuropsychological testing, would have caused impulsivity because of damage to the frontal lobe and therefore Derrick would have difficulty conforming his conduct to the dictates of law. However, he never specifically discussed how Derrick's mental impairment would have affected this particular crime and never linked up any of the conditions of Derrick's childhood or sexual abuse to the facts of this crime.
We note that the vote of the jury during resentencing was seven to fiveclose to the vote needed for a life recommendation. The jury's vote in the first penalty phase, in which evidence of the deprived childhood and sexual abuse was presented, was eight to four. In this case, it is difficult to speculate whether the result of the resentencing would have differed if counsel had presented evidence of Derrick's upbringing or mental health mitigation. However, in order to sufficiently undermine this Court's confidence in the outcome of the resentencing, Derrick must rely on more than mere speculation. Accordingly, we conclude that Derrick has failed to demonstrate prejudice. Because Derrick has failed to meet both prongs under Strickland, we find no error in the trial court's denial of Derrick's ineffective assistance of counsel claim.

3. CUMULATIVE ERROR
Derrick contends that trial counsel's numerous errors during the guilt and penalty phases deprived him of a fundamentally fair trial and that the lower court erred in finding that counsel's actions were not improper. Because this Court does not find individual error in any of Derrick's claims, Derrick's claim of cumulative error is also denied. See Griffin v. State, 866 So.2d 1, 22 (Fla.2003) ("Because the alleged individual errors are without merit, the contention of cumulative error is similarly without merit, and [the defendant] is not entitled to relief on this claim.").

B. PETITION FOR A WRIT OF HABEAS CORPUS
In his habeas petition, Derrick raises two claims of ineffective assistance of appellate counsel. Claims of ineffective assistance of appellate counsel are appropriately presented in a petition for a writ of habeas corpus. See Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000). Consistent with the Strickland standard, to grant habeas relief based on ineffectiveness of appellate counsel, this Court must determine
first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986); accord Freeman, 761 So.2d at 1069. In raising such a claim, "[t]he defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based." Freeman, 761 So.2d at 1069. "[C]laims of ineffective assistance of appellate counsel may not be used to camouflage issues that should have been presented on direct appeal or in a postconviction motion." Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000). "If a legal issue `would in all probability have been found to be without merit' had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate *463 counsel's performance ineffective." Id. (quoting Williamson v. Dugger, 651 So.2d 84, 86 (Fla.1994)).
In his first habeas claim, Derrick contends that appellate counsel provided ineffective assistance by failing to appeal the inaccuracies in the record, namely, that the record mistakenly indicates that the jury was not present in the courtroom when the prosecutor made his remarks concerning the proposed rebuttal testimony of Randall James. As in our discussion of trial counsel's alleged ineffectiveness on this issue, there is absolutely no indication that the record is incorrect. Certainly, appellate counsel cannot raise an issue if the record is devoid of information indicating that the error occurred. Further, Derrick does not allege that appellate counsel was even aware that the record might be incorrect or that he notified counsel of the inaccurate transcript. Because Derrick has failed to demonstrate that appellate counsel's conduct constituted deficient performance, we deny this claim.
In his second habeas claim, Derrick asserts that appellate counsel was ineffective for failing to appeal the State's improper closing argument. Specifically, Derrick alleges that the State: (1) made an improper closing argument regarding expert testimony; and (2) erroneously argued that defense counsel had conceded Derrick was guilty of a lesser crime. We deny this habeas claim because it is procedurally barred.
First, Derrick alleges that during closing arguments, the prosecutor inappropriately provided testimony by disputing the medical examiner's testimony regarding the murder weapon and victim's time of death. However, the record indicates that trial counsel did not object to the closing comments, thereby failing to preserve the issue for appellate review. Thus, appellate counsel could not be successful on appeal unless the argument was improper and constituted fundamental error. See Archer v. State, 934 So.2d 1187, 1205 (Fla.2006).
We have already rejected a similar claim regarding comments about the murder weapon in upholding the summary denial of Derrick's challenge to trial counsel's failure to object by determining these same closing arguments were not improper. Additionally, as to the prosecutor's disagreement with the medical examiner's estimation of time of death, such an argument does not constitute fundamental error; that is, error that "reach[es] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." State v. Delva, 575 So.2d 643, 644-45 (Fla.1991) (quoting Brown v. State, 124 So.2d 481, 484 (Fla. 1960)). Accordingly, we reject any claim of ineffective assistance of appellate counsel regarding the State's reference to the murder weapon and the victim's time of death during closing argument.
Second, Derrick asserts that the State erroneously argued that defense counsel conceded that Derrick was guilty of second-degree murder. However, Derrick's citation to the record incorrectly references the court's discussion of Randall James as a rebuttal witness, instead of referencing the allegedly improper closing statement. Therefore, this habeas claim is insufficiently pled.
Notwithstanding the insufficient pleading, Derrick's allegation of improper argument is also procedurally barred. In its response to Derrick's petition, the State quotes the prosecutor's closing argument, which stated: "So if you find that the defendant wasn't going to commit a robbery here, and/or he didn't intend consciously to kill Mr. Sharma, then you can look to Murder Two." During defense closing, *464 trial counsel countered: "See if it's [first degree murder] been proven beyond a reasonable doubt. Some things have. He [the prosecutor] proved that Rama was killed. And that's basically all he proved. He hasn't proved a robbery, and he sure as heck hasn't proved Jason is involved. That's what he's got to do." On rebuttal, the prosecutor responded: "Your job here today is to decide if this defendant is guilty of murder in the first degree. And Defense Counsel conceded, you have to look for murder in the second degree or manslaughter. Your job is to determine if this defendant is guilty of murder in the first degree or not guilty." Trial counsel failed to object to either of the State's comments regarding second-degree murder. Again, we have consistently held that appellate counsel cannot be ineffective for failing to appeal unpreserved errors that do not rise to the level of fundamental error. Here, the prosecutorial statements fail to constitute fundamental error. As Derrick's claim of error was not preserved and does not rise to the level of fundamental error, counsel had no obligation to raise it on appeal. We thus deny this habeas claim.

CONCLUSION
For the reasons explained above, we affirm the trial court's denial of postconviction relief and deny Derrick's petition for a writ of habeas corpus.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, CANTERO, and BELL, JJ., concur.
QUINCE, J., recused.
NOTES
[1] The trial court found the following aggravating factors: (1) the murder was committed in the course of a robbery; (2) the murder was committed to avoid arrest; (3) the murder was especially heinous, atrocious, or cruel (HAC); and (4) the murder was committed in a cold, calculated, and premeditated manner (CCP). Derrick, 581 So.2d at 34.
[2] Derrick argued that: (1) the trial court did not make an adequate inquiry under Richardson v. State, 246 So.2d 771 (Fla. 1971), into the prosecution's discovery violation; (2) the jury received highly prejudicial, irrelevant testimony which tainted the penalty recommendation; (3) he was denied a fair trial by being shackled throughout the proceedings; (4) he was denied a fair trial because the court did not inquire about jurors' exposure to prejudicial media coverage; (5) the trial court erred in limiting the defense's cross-examination of several State witnesses; (6) the trial court erred in overruling defense objections to the State's improper closing arguments; (7) he was denied the right to a fair penalty recommendation when the court rejected his proposed jury instructions; (8) the court's instructions on HAC were unconstitutionally vague; and (9) the imposed death sentence was unconstitutional under the Eighth and Fourteenth Amendments to the U.S. Constitution because the court applied improper aggravating circumstances and excluded existing mitigating circumstances.
[3] The Court concluded that it was inconsistent for the trial court to find both CCP and the avoid arrest aggravators. Derrick, 581 So.2d at 36-37.
[4] This Court addressed four issues in detail: (1) whether the trial court erred in responding to a jury inquiry regarding a tie vote; (2) whether the court erred in instructing the jury on the aggravating factors that the killing occurred during the course of a robbery and was committed for pecuniary gain; (3) whether the court erred in finding that the killing was committed to avoid or prevent a lawful arrest; and (4) whether the court erred in finding that the crime was especially heinous, atrocious, or cruel. Derrick v. State, 641 So.2d 378, 379-81 (Fla. 1994). The remaining claims were: (1) the trial court erred in failing to consider all nonstatutory mitigating factors; (2) the court erred in finding that the killing was committed in perpetration of a felony; and (3) the death penalty was disproportionate to the crime. Id. at 381 n. 4. The Court found these claims meritless. Id. at 381.
[5] Derrick asserted that: (1) he was denied access to files and records pertaining to his case in violation of his constitutional rights; (2) he received ineffective assistance of counsel during pretrial and at the guilt phase; (3) the State withheld material and exculpatory evidence or presented misleading evidence or both; (4) he received ineffective assistance of counsel during the penalty phase; (5) resentencing counsel was ineffective for failing to obtain a mental health expert; and (6) he was deprived of a fundamentally fair trial because of the cumulative error present during the proceedings.
[6] Although Derrick's second amended motion was filed in December 2001, his first amended rule 3.850 motion was filed in December 1998, before the rule change. See generally Fla. R.Crim. P. 3.851(a) ("This rule . . . shall apply to all postconviction motions filed on or after October 1, 2001, by prisoners who are under sentence of death. Motions pending on that date are governed by the version of this rule in effect immediately prior to that date."). Therefore, we analyze Derrick's claims under the summary denial standard set forth in rule 3.850(d).
[7] We question whether the testimony of an expert "confessionologist" would even be admissible but do not reach that decision in this postconviction proceeding. See Beltran v. State, 700 So.2d 132, 133 (Fla. 4th DCA 1997) (questioning whether expert testimony regarding the voluntariness of a confession is ever admissible).
[8] We also reject Derrick's claim that counsel was ineffective for failing to call lay witnesses at the suppression hearing because Derrick has failed to allege how such testimony would have led to the suppression of his confession.
[9] Additionally, Derrick asserts that counsel was rendered ineffective regarding the confession due to the State's misconduct in failing to provide complete police reports. With regard to Derrick's allegation of incomplete police reports, trial counsel was made aware of Detective Vaughn's partial report at the time of the initial trial and the report was then filed in the trial court. Any claim of error regarding misconduct in providing an incomplete report should have been raised on direct appeal. Further, as for any claim of ineffectiveness, Derrick has not identified any information in any other police report that would have led to suppression of his confession.
[10] Moreover, the record contains the psychological evaluation conducted by Dr. Nancy Simons who noted that it is "highly unlikely that [he] would be easily manipulated by the police or confused in being questioned by the police."
[11] For instance, Robert D'Antonio, a deputy sheriff, testified that Derrick became a tutor at the jail to teach other inmates to read, and Charlotte Wise, a neighbor, testified that Derrick would do anything asked of him for her family.
[12] We did not address Derrick's claim on his first direct appeal that the trial court erred in failing to find the sexual abuse as a mitigating circumstance.