PER CURIAM.
 

 Kenneth Allen Stewart appeals an order of the circuit court denying his motion to vacate his sentence of death filed under Florida Rule of Criminal Procedure 3.851. Stewart also petitions this Court for a writ of habeas corpus. We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), (9), Fla. Const. For
 
 *246
 
 the reasons expressed below, we affirm the postconviction court’s order and deny Stewart’s petition.
 

 I. BACKGROUND
 

 In 1986, Stewart was convicted of second-degree arson and first-degree murder for the shooting of Ruben Diaz. On direct appeal, this Court set out the facts of the crimes:
 

 Daniel Clark heard two gunshots on December 6, 1984, at about 12:15 a.m., “just a split second or two” apart. He got out of bed, walked outside, looked down the road in both directions, but saw nothing. At approximately 1:00 that same morning, Linda Drayne spotted a body lying alongside the road and reported it to the police. Investigation revealed that the body was that of Ruben Diaz, who had been shot twice from a distance of a foot or less, once in the front of the head, and once behind the right ear. Sometime after midnight, police also discovered Diaz’s car, which had been set on fire in a mall parking lot. Several months later, Stewart was arrested in connection with another crime and while in custody was charged with first-degree murder and second-degree arson for the instant offenses. During the guilt phase of the trial, Randall Bil-brey, who shared a trailer with Stewart from December 9 to December 19, 1984, testified that Stewart told him that he and another man were looking for someone to rob when they spotted a big, expensive-looking car outside a bar. They went in and engaged the car’s owner, Diaz, in conversation, convincing him to give them a ride. Once in the car, Stewart, who sat in the back seat, pulled a gun and ordered Diaz to drive to a wooded area where he ordered Diaz to get out of the car, lie on the ground, and place his hands on his head. He took Diaz’s wallet, which contained fifty dollars, and a small vial of cocaine, and then, at the urging of the second man, shot Diaz twice in the head. Stewart and the second man later burned the ear to destroy fingerprints.
 

 The state’s second key witness was Terry Smith, a friend with whom Stewart shared an apartment. Smith testified that Stewart told him that a man picked him up hitchhiking and that he pulled a gun, ordered the man to drive to a certain location where Stewart ordered the man out of the car, made him lie on the ground, robbed him, and shot him twice.
 

 Stewart v. State (Stewart I),
 
 558 So.2d 416, 418 (Fla.1990). Stewart was sentenced to fifteen years in prison on the arson count and sentenced to death on the murder count.
 

 On direct appeal, Stewart raised two guilt-phase claims and several penalty-phase claims. This Court affirmed Stewart’s convictions, but because the sentencing court improperly refused to give a requested instruction on the statutory mitigating circumstance of substantially impaired capacity, this Court reversed the death sentence and remanded for a new penalty phase.
 
 Id.
 
 at 421. After a second penalty phase, the jury unanimously recommended a death sentence, and the sentencing court sentenced Stewart to death. The sentencing court found two aggravating and no mitigating circumstances. This Court affirmed the death sentence.
 
 Stewart v. State (Stewart II),
 
 620 So.2d 177 (Fla.1993).
 

 Stewart then filed a motion for postcon-viction relief. Stewart’s trial counsel asserted that he had been ineffective when he represented Stewart during the second penalty phase. Stewart agreed to waive any potential guilt-phase claims, and the State agreed to a new penalty phase.
 
 *247
 

 Stewart v. State (Stewart III),
 
 872 So.2d 226, 227 (Fla.2008).
 

 A third penalty phase was conducted in March 2001. The jury recommended a death sentence by a vote of seven to five. After conducting a hearing pursuant to
 
 Spencer v. State,
 
 615 So.2d 688 (Fla.1993), the sentencing court imposed the death sentence. The sentencing court found three aggravating circumstances, two statutory mitigating circumstances, and numerous nonstatutory mitigating circumstances applicable to the murder. The sentencing court explained that in its view, the circumstances underlying the prior violent felony aggravating factor were “so egregious” and “so horrific” that that factor alone far outweighed all of the mitigation. Stewart raised five issues on appeal. This Court affirmed the death sentence.
 
 Stewart III,
 
 872 So.2d at 229.
 

 In February 2006, Stewart filed an amended motion to vacate judgment of conviction and sentence pursuant to rule 3.851, Florida Rules of Criminal Procedure. The postconviction court granted an evidentiary hearing on all but one of Stewart’s claims of ineffective assistance of counsel and on his claims that his right to confrontation had been violated. In October 2008, the postconviction court issued an order denying relief. Stewart now appeals the postconviction court’s order. He argues that the postconviction court erred in denying his claims of ineffective assistance of counsel.
 
 [1]
 
 Stewart also petitions this Court for a writ of habeas corpus, raising four claims.
 

 II. MOTION FOR POSTCONVICTION RELIEF
 

 On appeal, Stewart contends that the postconviction court should have found that trial counsel provided ineffective assistance by failing to (A) discover and present evidence of organic brain damage; (B) investigate and present mitigating evidence concerning Stewart’s childhood and family; and (C) object to the cross-examination of defense penalty-phase witness Marjorie Sawyer.
 

 In order to prevail on a claim of ineffective assistance of counsel, a defendant must show both that trial counsel’s performance was deficient and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial.
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As to the first prong, the defendant must establish that “counsel made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment.”
 
 Id.
 
 at 687, 104 S.Ct. 2052;
 
 see also Cherry v. State,
 
 659 So.2d 1069, 1072 (Fla.1995). For the second prong,
 
 “Strickland
 
 places the burden on the defendant, not the State, to show a ‘reasonable probability’ that the result would have been different.”
 
 Wong v. Belmontes,
 
 — U.S. -, - - -, 130 S.Ct. 383, 390-91, 175 L.Ed.2d 328, 337 (2009) (quoting
 
 Strickland,
 
 466 U.S. at 694,
 
 *248
 
 104 S.Ct. 2052).
 
 Strickland
 
 does not “require a defendant to show ‘that counsel’s deficient conduct more likely than not altered the outcome’ of his penalty proceeding, but rather that he establish ‘a probability sufficient to undermine confidence in [that] outcome.’ ”
 
 Porter v. McCollum,
 
 — U.S. -, - - -, 130 S.Ct. 447, 455-56, — L.Ed.2d -, - - - (2009) (quoting
 
 Strickland,
 
 466 U.S. at 693-94, 104 S.Ct. 2052). This Court employs a mixed standard of review, deferring to the postconviction court’s factual findings that are supported by competent, substantial evidence, but reviewing legal conclusions de novo.
 
 See Sochor v. State,
 
 883 So.2d 766, 771-72 (Fla.2004).
 

 A. Organic Brain Damage
 

 Stewart contends that the postconviction court erred in denying his claim that trial counsel was ineffective in failing to obtain a complete neuropsychological examination and a PET scan. He asserts that the testing and scan would have established that he had left-hemisphere, organic brain damage. Stewart also asserts that Dr. Michael Scott Maher, Dr. Fay E. Sultan, and Dr. Ervin B. Weiner, who evaluated him in preparation for resentencing, failed to provide competent mental health services to him. To evaluate the merits of these claims, we first review the relevant evidence presented during the penalty phase in 2001 and then summarize the evidence presented at the postconviction evidentiary hearing.
 

 During the 2001 penalty phase, Dr. Maher testified as an expert in forensic psychiatry. Dr. Maher diagnosed Stewart as suffering from posttraumatic stress disorder (PTSD) at the time of the crime. He explained that the PTSD was related to extreme childhood trauma and abuse and described Stewart’s stepfather, Bruce Scarpo, as “abusive to the point of inflicting torture on his family.” Dr. Maher also testified that Stewart was intoxicated at the time of the offense. Dr. Maher opined that “it [was] because of these aspects of [Stewart’s] background, that he was compelled in an unthinking reactive way to commit these horrible events — this horrible event.” Dr. Maher further opined that “as a result of [Stewart’s] mental illnesses, he had a very, um, substantial impairment in his capacity to conform his behavior to the requirements of law; that his ability to choose and do the right thing, was very severely impaired.”
 

 Dr. Sultan, who testified as an expert in forensic psychology, opined that at the time of the offense Stewart was under the influence of extreme mental or emotional disturbance and that his capacity to conform his conduct to the requirements of the law was substantially impaired. Her diagnosis was based on three factors. First, she explained that he had “a lifelong history of mental illness,” including severe depression, and came from a family of individuals with serious mental problems, including bipolar disorder, manic depressive illness, and major depression. Dr. Sultan noted that Stewart had made three “serious suicide attempts” and that “the clarity of his thinking and his judgment [had] been deeply affected by his mental illness.” Second, Dr. Sultan discussed Stewart’s “terrible substance abuse problem,” which would affect his ability to control his impulses. Third, Dr. Sultan testified that Stewart was “very highly traumatized” by his childhood and manifested “many of the symptoms of post traumatic stress disorder.” She explained that Stewart was not able to think situations through, was not able to control inappropriate or violent impulses, and did not have a clear rational mind. She stated that around the time of the murders, Stewart “had reached a real despairing
 
 *249
 
 point in his life, a crisis point in his life” and had “deteriorated very rapidly.”
 

 The State called Dr. Sidney Merin, who specialized in clinical psychology and neu-ropsychology. Dr. Merin testified that as a result of Stewart’s “background and his depression,” Stewart had attempted suicide on several occasions since age twelve. Dr. Merin concluded that Stewart had a history of alcohol dependence and perhaps abused other substances. Dr. Merin stated that emotion from past events “probably is what prompted [Stewart] to start drinking and [using] drugs, um, early in life,” but he did not think that the emotional distress affected Stewart’s thinking in terms of moral or legal issues. Dr. Merin concluded that although Stewart’s behavior “was an end product of extreme emotional distress,” he did not think that Stewart was under extreme mental or emotional distress at the time of the murder. Dr. Merin also opined that he did not believe that Stewart’s capacity to conform his conduct to the requirements of law was substantially impaired at the time of the offense.
 

 During the postconviction evidentiary hearing, Stewart called Dr. Hyman Eisenstein and Dr. Frank Balch Wood to testify about his mental health. In response, the State called Dr. Maher and Dr. Larry Habelson Wilf.
 

 Dr. Eisenstein, a psychologist certified in neuropsychology, explained that when he tested Stewart in preparation for- the evidentiary hearing, Stewart had a full scale IQ of ninety-eight, with a discrepancy between verbal and perceptual tests of thirteen points. Dr. Eisenstein stated that this discrepancy was statistically significant and consistent with impaired left-brain functioning. Stewart’s performance on other tests also consistently showed impairment in the left hemisphere. Dr. Eisenstein diagnosed Stewart as suffering from dementia due to head trauma, the DSM-IV-TR diagnosis that most closely matched Stewart’s brain damage, and attention deficit/hyperactivity combined disorder (ADHD). Dr. Eisenstein opined that Stewart had a learning disorder and probably suffered from PTSD at the time of the offense.
 

 Dr. Eisenstein testified that left-hemisphere brain damage results in trouble with decision-making and impulse control, irritability, inflexible thinking, and constriction of affect. He further testified that alcohol would have affected Stewart in a negative manner and that ADHD and brain damage would have exacerbated each other. Dr. Eisenstein explained that the diagnoses of ADHD, PTSD, and alcohol abuse are “symptoms of behavior manifestations” of the “underlying problem” of organic brain damage and that the combination of those disorders led to the murder. He described Stewart’s brain impairment as the “driving force” behind his behavior and concluded that Stewart committed the crimes in “an unthinking and reactive way.” Dr. Eisenstein stated that Stewart was under severe emotional stress most of his life because of his upbringing and opined that both statutory mental health mitigating factors were applicable to the Diaz murder.
 

 In addition to giving opinions about Stewart’s mental and emotional health, Dr. Eisenstein critiqued the work of other experts who previously evaluated Stewart. While on the stand, Dr. Eisenstein read a report prepared by Dr. Weiner in 2001. Dr. Weiner’s report indicated that he performed some neuropsychological testing on Stewart and found no indications of neu-ropsychological impairment that might indicate organic brain damage or dysfunction. Dr. Eisenstein explained that he did not credit Dr. Weiner’s conclusions because he felt that Dr. Weiner should have
 
 *250
 
 done more testing. Dr. Eisenstein explained that it is not unusual for someone with brain damage to perform normally on some tests because brain damage may be “specific to certain areas of the brain.” He testified that Dr. Weiner administered tests designed to measure academic performance but did not administer a full memory examination or tests designed specifically for brain impairment. Dr. Eisenstein testified that he did not review the findings of Dr. Maher and Dr. Sultan, but he opined that unless those doctors had the benefit of a full neuropsychological battery of tests and expertise in interpreting those tests, they could not fully assess whether Stewart had brain damage.
 

 The defense also called Dr. Wood, a neuropsychologist. Dr. Wood testified that the PET scan, CT scan, and MRI of Stewart’s brain all showed “an enlarged left lateral ventricle” that was not symmetrical to the right lateral ventricle. The PET scan showed a “thinning and weakening of the activity of the left hemisphere in roughly the central posterior region.” Dr. Wood opined that if a neuropsychologist had concluded that Stewart suffered from left-hemisphere brain damage, the findings from the PET scan would be corroborative of that diagnosis. Dr. Wood concluded that the abnormalities in Stewart’s brain were “chronic and not recent and that they [were] probably developmental in origin.”
 

 In response, the State called Dr. Maher. Dr. Maher testified that in preparation for the penalty phase, he and trial counsel discussed competency, sanity, mitigation, and “additional testing that might be useful to do on Mr. Stewart for his case.” Dr. Maher explained that he did not think neuropsychological testing was indicated— that is, “reasonable and necessary” — in this case. Dr. Maher testified that other psychiatrists and psychologists likewise examined Stewart and to his knowledge none of them recommended further or more extensive neuropsychological testing.
 

 Dr. Maher expressly disagreed with several aspects of Dr. Eisenstein’s testimony. Dr. Maher testified that a psychiatrist can diagnose organic brain damage and that he had made such a diagnosis in other cases. Dr. Maher stated that the idea that only a neuropsychologist can identify signs or symptoms of neuropsychological impairment is “faulty” and that in fact “[i]t is a part of a general medical evaluation to evaluate the workings of a person’s brain.” Dr. Maher further testified that he does not think that Dr. Weiner’s battery of tests was inadequate and incomplete. He opined that what testing should be done is necessarily a case-by-case determination. He stated, “[T]he term ‘full neuropsycho-logical battery” ... is not a clear absolute definable term” but instead “calls for a clinical judgment about what is necessary.” Dr. Maher noted that Dr. Merin, who examined Stewart and testified during the penalty phase on behalf of the State, was certified in neuropsychology.
 

 Dr. Maher also disagreed with Dr. Eisenstein’s conclusions about Stewart’s mental health. Dr. Maher testified that the results of Dr. Eisenstein’s testing did not change his diagnosis that Stewart suffered from PTSD, rather than brain impairment or ADHD, at the time of the offense. Dr. Maher concluded that Stewart’s above-average performance on the Wisconsin Card Sorting Test undermined Dr. Eisenstein’s diagnosis of brain damage and opined that “within all reasonable medical possibility [Stewart] does not have brain damage.” Next, Dr. Maher disagreed with Dr. Eisenstein’s diagnosis of ADHD. Dr. Maher explained that the diagnostic manual provided that ADHD “should be excluded when other mental health problems, brain illness, or circumstances better explain the signs and symp
 
 *251
 
 toms of the disorder” and in this case a diagnosis of PTSD better explained the “total picture” of Stewart’s life. Overall, Dr. Maher opined that “the horrible abuse that [Stewart] suffered in childhood and the resulting traumatic stress disorder” was the driving force behind Stewart’s criminal acts.
 

 The State also called Dr. Wilf, a nuclear medicine physician, who opined that Stewart’s PET scan was “normal.” He stated that the apparent differences in the hemispheres of Stewart’s brain may be explained in part by Stewart’s head position in the scanner.
 

 1. Claim of Ineffective Assistance of Counsel
 

 Stewart contends that the postcon-viction court erred in denying his claim that trial counsel was ineffective in failing to obtain a complete neuropsychological examination and a PET scan. He asserts that had counsel performed a more thorough investigation, evidence like that presented at the postconviction evidentiary hearing could have been presented at the penalty phase and would have resulted in a life sentence. The postconviction court denied this claim because it found that trial counsel’s investigation of Stewart’s mental health — which consisted of asking one expert to evaluate Stewart for any signs of neuropsychological impairment indicating brain damage or dysfunction and consulting two other qualified mental health experts — was reasonable. The postconviction court explained that Stewart “failed to show that counsel performed ineffectively regarding brain damage mitigation when he specifically requested an evaluation for potential brain damage or dysfunction and his own mental health experts did not diagnose brain damage or otherwise advise counsel to pursue that avenue.” The post-conviction court further found that even if trial counsel was deficient, Stewart did not prove prejudice. We agree. Stewart did not demonstrate that counsel was deficient or that he was prejudiced.
 

 As noted by the postconviction court, in
 
 Darling v. State,
 
 966 So.2d 366 (Fla.2007), this Court rejected a similar claim that counsel was deficient for failing to order a neuropsychological assessment and develop evidence of brain damage for the penalty phase. In that case, trial counsel presented penalty-phase expert testimony that Darling was abused by his father, had a low IQ, and had difficulties in school. The sentencing court found many nonstat-utory mitigating factors related to Darling’s background and childhood.
 
 Id.
 
 at 372. During a postconviction evidentiary hearing, Darling presented a psychologist and a neuropsychologist who testified that Darling suffered from frontal lobe damage, which would cause him to behave in socially unacceptable ways.
 
 Id.
 
 at 374. This Court determined that counsel’s representation was reasonable, explaining:
 

 [I]n preparing for the penalty phase, trial counsel relied on the evaluation of psychiatric expert Dr. Michael Hercov. Darling’s trial counsel confirmed that he relied on the evaluation performed by his expert, Dr. Hercov, and would not have ordered a neuropsychological evaluation absent a recommendation by Dr. Hercov. Also, Dr. David Frank established during the evidentiary hearing that Darling’s irritability and changed behavior was the result of being abused rather than organic brain damage. Dr. Frank added that stuttering after being abused is a normal response produced by fear and anxiety. Dr. Frank also added that Darling’s impulsivity, frequent fights, and poor planning were all indicative of the diagnosis that Darling had antisocial personality disorder.
 

 This Court has established that defense counsel is entitled to rely on the
 
 *252
 
 evaluations conducted by qualified mental health experts, even if, in retrospect, those evaluations may not have been as complete as others may desire.
 
 See State v. Sireci,
 
 502 So.2d 1221, 1223 (Fla.1987). Even if the evaluation by Dr. Hercov, which found no indication of brain damage to warrant a neuropsycho-logical workup, was somehow incomplete or deficient in the opinion of others, trial counsel would not be rendered ineffective for relying on Dr. Hercov’s qualified expert evaluation.
 
 See id.
 
 Therefore, trial counsel was not ineffective for failing to order a neuropsychological evaluation.
 

 Id.
 
 at 377. Similarly, in
 
 Reese v. State,
 
 14 So.3d 913, 918 (Fla.2009), this Court determined that trial counsel could not be deemed ineffective for failing to request a neuropsychological evaluation where at the time of the penalty phase neither a well-known “death penalty mitigation expert” nor experienced trial counsel had reason to believe further testing was warranted.
 

 As in
 
 Darling,
 
 there is competent, substantial evidence that Stewart’s defense counsel consulted with numerous mental health experts. The defense presented two mental health experts, Dr. Maher and Dr. Sultan, at the penalty phase. The record shows that these penalty-phase experts testified about diagnoses other than brain damage that accounted for Stewart’s behavior. Specifically, Dr. Maher opined that Stewart suffered from PTSD and substance abuse problems, and Dr. Sultan opined that Stewart suffered from a history of mental illness, substance abuse problems, and trauma from his abusive upbringing. Both experts opined that Stewart’s childhood trauma and his substance abuse resulted in Stewart having a substantially impaired capacity to conform his behavior to the requirements of the law at the time of the offense. Additionally, while the record is not entirely clear as to whether they were retained by the defense, the record shows that prior to the conclusion of his trial Stewart was evaluated by four other mental health experts — Drs. Mussenden, Afield, Gonzalez, and Gamache. And finally, the postcon-viction hearing evidence established that the defense also consulted Dr. Weiner in preparation for the penalty phase. Stewart did not, however, establish that any mental health expert had recommended to trial counsel that Stewart undergo neu-ropsychological testing. Defense expert Dr. Eisenstein conceded that he was not aware of any of the above experts recommending neuropsychological testing.
 

 Moreover, unlike in
 
 Darling,
 
 Stewart’s defense counsel consulted a neuropsychologist as part of his penalty-phase investigation. A March 2001 report by Dr. Weiner, a licensed psychologist, stated that counsel “asked me to examine [Stewart] for any indications of neuropsychological impairment that might indicate organic brain damage or dysfunction.” The report indicated that Dr. Weiner performed the testing that he deemed appropriate and concluded that Stewart did not have brain damage:
 

 [T]he test findings do not demonstrate neuropsychological impairments consistent with the presence of brain damage or dysfunction. Mr. Stewart is functioning in the average range of intelligence, with a measured IQ of 100, and his abilities to attend, remember, reason, form concepts, organize his visual impressions, coordinate his perceptual-motor functions, and alter his mental set are within normal limits.
 

 As explained in
 
 Darling
 
 and
 
 Reese,
 
 trial counsel’s reliance on his retained experts is not proven unreasonable simply because another expert, in this case Dr. Eisenstein, questions the thoroughness of the prior
 
 *253
 
 evaluations.
 
 See also State v. Sireci,
 
 502 So.2d 1221, 1228 (Fla.1987) (“Counsel cannot be deemed ineffective under the standards set forth in
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), simply because he relied on what may have been less than complete pretrial psychiatric evaluations.”). In this case, Stewart did not prove that a reasonable trial attorney should have known to not rely on the conclusions offered by the mental health experts who evaluated him. Thus, he did not prove that his counsel was deficient.
 

 Stewart also failed to demonstrate that he was prejudiced by trial counsel’s investigation and presentation of mental health evidence. Stewart heavily relies on the fact that the jury recommended death by a vote of seven to five. Stewart’s case, however, is not one in which the defendant nearly received a life recommendation despite defense counsel doing little investigation and wholly failing to present mental health mitigation evidence during the penalty phase.
 
 See, e.g., Rose v. State,
 
 675 So.2d 567, 572-74 (Fla.1996) (vacating death sentence and remanding for new sentencing proceeding due to counsel’s failure to meaningfully investigate mitigation);
 
 Phillips v. State,
 
 608 So.2d 778, 782-83 (Fla.1992) (similar). Rather, Stewart’s trial counsel consulted with several mental health experts and presented expert testimony during the penalty phase. Given this record, Stewart’s speculation about the effect that additional evidence would have had on the jury is insufficient to undermine confidence in his sentence.
 
 See Derrick v. State,
 
 983 So.2d 443, 462 (Fla.2008) (explaining that “speculation” about whether additional evidence about defendant’s upbringing and mental health could have altered the sentencing proceeding where the jury recommended death by a vote of seven to five was insufficient to prove prejudice).
 

 Stewart has also failed to show prejudice such that the Court’s confidence in his sentence is undermined because he cannot demonstrate that the postconviction evidence would have changed the sentencing court’s conclusion that the aggravating factors greatly outweighed the mitigating factors.
 
 See Hurst v. State,
 
 18 So.3d 975, 1013 (Fla.2009) (“Penalty phase prejudice under the
 
 Strickland
 
 standard is measured by whether the error of trial counsel undermines this Court’s confidence in the sentence of death when viewed in the context of the penalty phase evidence and the mitigators and aggravators found by the trial court.”).
 

 The sentencing court found three aggravating circumstances applicable to the murder: (1) Stewart previously had been convicted of violent felonies (first-degree murder, two attempted murders, armed robbery, aggravated assault, and attempted armed robbery); (2) he was under a sentence of imprisonment at the time of the murder; and (3) he committed the murder for pecuniary gain. The sentencing court gave aggravating circumstances one and three “great weight” and gave circumstance two “modest weight.”
 

 The sentencing court found and gave “some weight” to two statutory mitigating factors — extreme mental disturbance and substantially impaired capacity to conform conduct to the requirements of the law— despite concluding that Stewart’s mental disturbance did not rise to the level of extreme and his impairment was not substantial. Finally, the sentencing court found and weighed twenty-three nonstatu-tory mitigating circumstances: Stewart suffered physical brutality during childhood, witnessed physical violence against others, suffered gross emotional stress during childhood, demonstrated an inability to adapt to his surroundings, suffered
 
 *254
 
 abuse by an aunt while in her care, lacked role models, lacked a father during his tender years, learned at age twelve that the man he believed to be his father was his stepfather, suffered abandonment by his mother, lacked a mother during his tender years, suffered a lifelong obsession with his mother, abused alcohol as a child, was intoxicated at the time of the offenses, engaged in long-term alcohol abuse, had low-normal intelligence, had an eighth-grade education, endured homelessness, experienced mental illness and a family history of mental illness, was remorseful for the killing, demonstrated compassion for others while incarcerated, took an interest in spiritual development during incarceration, received a sentence of 130 years in prison on unrelated charges, and had a good prison record. Most of these nonstatutory mitigating factors were given “some” or “modest” weight, although a few were given “little” or no additional weight because they were cumulative to other mitigating factors.
 

 During the evidentiary hearing, Dr. Eisenstein testified that Stewart suffered from ADHD and left-hemisphere brain damage, which was the “driving force” behind his behavior, and opined that Stewart was under severe emotional stress most of his life because of his upbringing. Dr. Wood testified that the PET scan indicated chronic abnormalities in the left hemisphere of Stewart’s brain and that the scan results would be corroborative of a diagnosis of brain damage. Dr. Wood stated generally that left-hemisphere brain damage can impede higher level cognitive processing, but he did not offer any opinion about how the brain abnormalities may have affected Stewart’s behavior at the time of the offense.
 

 The sentencing court gave “some weight” to the statutory mitigating factor of extreme mental or emotional disturbance at the time of the offense because it was not convinced that Stewart’s distress was extreme. The sentencing court credited the testimony of State expert Dr. Merin over that offered by Dr. Maher and Dr. Sultan. Dr. Merin had concluded that rather than mental illness or emotional disturbance, Stewart had a character or behavior disorder and suffered from general distress for most of his life. Dr. Eisenstein’s postconviction testimony would have contradicted Dr. Merin’s appraisal that Stewart had a character disorder but would not have dispelled the impression that Stewart’s emotional stress was a life-long state, rather than an acute episode at the time of the murder. Thus, it seems unlikely that the evidence presented at the evidentiary hearing would cause the sentencing court to place significantly more weight on this mitigating factor.
 

 As to the impaired capacity statutory mitigating factor, the sentencing court concluded that Stewart’s capacity “was impaired due to the combination of factors presented to this Court regarding his background.” However, based on Stewart’s ability to methodically select his victim, lure the victim to an isolated location, shoot the victim twice from close range, and then burn the victim’s car, the sentencing court found that Stewart had the capacity to choose his actions, and accordingly, the impairment was not substantial. Like Dr. Maher and Dr. Sultan, Dr. Eisenstein testified that Stewart’s “thinking processes [were] disorganized and scattered” and that Stewart committed the crimes in “an unthinking and reactive way.” But also like the prior defense experts, Dr. Eisenstein did not explain how Stewart’s allegedly substantially impaired capacity was consistent with Stewart’s ability to devise and execute a plan to lure the owner of an expensive-looking car to an isolated location in order to rob him. As a
 
 *255
 
 result, it again seems unlikely that the evidence presented at the evidentiary hearing would have caused the sentencing court to place significantly more weight on this mitigation factor.
 

 Stewart’s case does not seem distinguishable from
 
 Derrick,
 
 in which this Court concluded that postconviction expert testimony about previously unpre-sented brain damage was not “particularly compelling” where the expert “never specifically discussed how Derrick’s mental impairment would have affected this particular crime and never linked up any of the conditions of Derrick’s childhood or sexual abuse to the facts of this crime.” 983 So.2d at 461-62. Notably, the jury recommendation in
 
 Derrick
 
 was also by a seven-to-five vote. Nor is Stewart’s case materially distinguishable from
 
 Owen v. State,
 
 986 So.2d 534, 552-53 (Fla.2008), in which this Court determined that additional mental health mitigation did not undermine confidence in the sentence where the murder was “calculated” and “deliberate” and the postconviction expert “did not offer an opinion as to whether Owen’s actions on the night of the offense demonstrated impulsivity.”
 
 See also Lynch v. State,
 
 2 So.3d 47, 73 (Fla.2008) (“Moreover, Lynch has not connected any cognitive impairment to the events of March 5, 1999, which, in contrast, reveal a carefully crafted murder plot.”).
 

 Finally, Stewart has not established that the jury’s sentencing recommendation and the trial court’s sentence would have changed if the postconviction evidence had been presented to the jury and the sentencing court. The sentencing court explained that in its view, the convictions underlying the prior violent felony aggravating factor — convictions for murder, two attempted murders, armed robbery, attempted armed robbery, and aggravated assault — were “so egregious” and “so horrific” that that factor alone far outweighed all the mitigation presented. Moreover, the sentencing court did find and evaluate mental health mitigation, and Stewart cannot demonstrate that this additional evidence would have undermined this Court’s determination that the death penalty was proportionate. Thus, Stewart’s postcon-viction presentation regarding evidence of brain damage did not undermine confidence in his death sentence.
 

 2. Claim of Ineffective Assistance of Mental Health Experts
 

 In
 
 Ake v. Oklahoma,
 
 470 U.S. 68, 84, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the United States Supreme Court concluded that in a sentencing proceeding, “due process requires access to a psychiatric examination on relevant issues, to the testimony of the psychiatrist, and to assistance in preparation at the sentencing phase.” While ordinarily a postconviction claim based on
 
 Ake
 
 is procedurally barred because it could have been raised on direct appeal, a defendant is entitled to litigate during postconviction a claim that a prior mental health expert’s examination was so “grossly insufficient” that the expert “ignore[d] clear indications of either mental retardation or organic brain damage.”
 
 Raleigh v. State,
 
 932 So.2d 1054, 1060 (Fla.2006) (quoting
 
 Sireci,
 
 502 So.2d at 1224). We affirm the denial of Stewart’s postcon-viction claim. Stewart did not demonstrate that his mental health experts ignored clear indications of organic brain damage.
 

 At trial, Dr. Maher testified that he met with Stewart briefly and reviewed “extensive records” from other doctors and documentation such as police reports. Dr. Sultan explained that prior to the 2001 penalty phase, she met with Stewart for about twenty hours. She reviewed school and jail records, reviewed records about Stewart’s suicide attempts, talked to
 
 *256
 
 Stewart’s family members and friends, and administered psychological tests— specifically an IQ test and the Minnesota Multiphasic Personality Inventory (MMPI). Dr. Weiner’s report indicated that he met with Stewart in preparation for the penalty phase and administered the following “intellectual and cognitive tests”: Bender Visual Motor Gestalt Test; Boston Naming Test; Stroop Neuropsy-chological Screening Test; Verbal Fluency Test; Wechsler Adult Intelligence Scale-Ill (WAIS-III); Wechsler Memory Scale-Ill; and Wide Range Achievement Test-3.
 

 Stewart asserts that these evaluations were inadequate because Dr. Maher and Dr. Sultan were not qualified to conduct neuropsychological testing and because Dr. Weiner did not conduct a full battery of such tests. Stewart’s claim is not persuasive.
 

 Without being familiar with what testing Dr. Maher and Dr. Sultan may have administered or reviewed, Dr. Eisenstein initially opined that unless those doctors had the benefit of a full neuropsychological battery and expertise in interpreting those tests, they could not fully assess whether Stewart had brain damage. Yet, elsewhere in his testimony, Dr. Eisenstein seemed to equivocate about whether Dr. Maher and Dr. Sultan could have been qualified to screen Stewart for brain damage. When asked if a psychiatric examination is inadequate for determining whether more testing for brain damage is necessary, he testified:
 

 No, that’s not true. A good psychiatrist understands the issues, hopefully through a mental status examination and through a behavioral observation and understanding the pathology of brain impairment and the behavior manifestation. Of course, if there’s history [a good psychiatrist] would understand ... the need to do continuing evaluation and certainly would request that and would want that.
 

 Dr. Eisenstein further explained that he did not credit Dr. Weiner’s conclusions because he felt that Dr. Weiner should have done more testing. He testified that Dr. Weiner administered tests designed to measure academic performance but did not administer a full memory examination or tests designed specifically to detect brain impairment. In contrast, Dr. Maher testified that a psychologist or a psychiatrist is qualified to determine if neuropsychological testing is warranted and opined that Dr. Weiner’s testing was adequate to diagnose Stewart.
 

 Furthermore, while Dr. Eisenstein testified that the results of his testing indicated that Stewart likely had brain damage — for example, he considered the thirteen-point score discrepancy in Stewart’s verbal and performance IQ scores to be significant— he did not point to any test results available at the time of resentencing that should have alerted the prior experts to the need to perform additional neuropsy-chological testing. Stewart argues that Dr. Weiner should have known to investigate the thirteen-point discrepancy, but when Dr. Weiner administered the WAIS-III in 2001, Stewart had a verbal score of 98 and a performance score of 102.
 

 Finally, the record supports the postcon-viction court’s characterization of Stewart’s brain damage as “possible brain damage” rather than clearly established brain damage. Dr. Eisenstein and Dr. Wood opined that Stewart’s left hemisphere was damaged, but Dr. Maher opined that Stewart’s performance on the Wisconsin Card Sorting Test undermined the diagnosis of brain damage. And although the postconviction court did not find his testimony persuasive because he was unfamiliar with assessing brain scans for neurocognitive issues, Dr.
 
 *257
 
 Wilf opined that Stewart’s brain scans indicated a normal brain.
 

 In summary, Stewart has not identified clear signs of brain damage that his penalty-phase mental health experts overlooked.
 
 See generally Raleigh,
 
 932 So.2d at 1060 (“Dr. Bordini’s testimony did not establish that Dr. Upson missed any clear indications of mental retardation or organic brain damage, thereby rendering Dr. Up-son’s evaluation ‘grossly insufficient’ under
 
 Sireci”).
 
 An expert’s evaluation “is not rendered less than competent ... simply because [the] appellant has been able to provide testimony to conflict with that presented” by the expert.
 
 Jones v. State,
 
 732 So.2d 313, 320 (Fla.1999). Accordingly, Stewart is not entitled to postconviction relief based on
 
 Ake.
 

 B. Stewart’s Childhood and Family
 

 Stewart contends that the postcon-viction court erred in denying his claim that trial counsel was ineffective for failing to present mitigating evidence about Stewart’s childhood and family. The postcon-viction court denied this claim because Stewart “failed to show that counsel performed deficiently for failing to present evidence that was essentially cumulative to the evidence presented during the penalty phase.” The postconviction court also denied this claim because it concluded that Stewart failed to prove prejudice. The postconviction court did not err in denying relief.
 

 Stewart’s case is not one in which trial counsel failed to investigate mitigation. During the 2001 penalty phase, the defense called the expert witnesses discussed in the previous section of this opinion and four lay witnesses. Susan Smith-Moore and Linda Arnold, Stewart’s stepsisters, testified about life in the home of Stewart’s stepfather, Bruce Scarpo. Lillian Brown, Stewart’s paternal aunt, testified about Stewart’s biological relatives and her memories of his childhood. Marjorie Sawyer testified about Stewart’s lifestyle around the time of the murder. The parties also stipulated that Stewart drank eight or nine beers before the shooting. More specifically, Stewart’s stepsisters and aunt testified that Stewart was beaten by Scarpo; forced to watch Scarpo’s wife Joanne, who was a mother-figure to Stewart, be beaten; forced to work in a bar as a young child; permitted to drink alcohol as a child; derided by Scarpo for having a lisp and trouble with enuresis; and devastated upon learning of his true parentage and his mother’s death. The mental health experts and Stewart’s aunt established that Stewart attempted suicide and had a family history of mental illness.
 

 During the postconviction evidentiary hearing, Stewart called nine witnesses. As . discussed above, Stewart called Dr. Eisenstein and Dr. Wood. In addition, Stewart called Pastor Robert VanHorne, who knew Stewart’s family during his childhood; Sandra Hibbard, who married Stewart’s biological father; Terri Stewart, Stewart’s half-sister; Wanda Vetra, Stewart’s maternal aunt; and Susan Smith Moore, Linda Arnold, and Nicole Scarpo, Stewart’s stepsisters.
 

 Competent, substantial evidence supports the postconviction court’s conclusion that the postconviction evidence was cumulative to that presented in the penalty phase. The testimony presented at the evidentiary hearing was lengthier and somewhat more detailed but cumulative in character and substance. The primary added details were that Scarpo knocked Stewart unconscious, rubbed feces in Stewart’s face as a punishment, and held a gun to his wife’s head in front of the children. There was testimony establishing that Stewart was hyperactive and had trouble in school. There also was testimony that Stewart and his siblings were abu
 
 *258
 
 sive to one another and that Joanne Scar-po sometimes beat the children. Finally, much of the evidentiary hearing testimony concerned biological relatives with whom Stewart had little or no contact. None of these details changed the previously established impression of Stewart’s childhood and mental health.
 

 Because the evidence that Stewart argues should have been presented is cumulative, Stewart has demonstrated neither deficiency nor prejudice. For example, in
 
 Lynch,
 
 this Court determined that counsel was not deficient for choosing to present mitigating evidence concerning the defendant’s childhood through a mental health expert and the defendant himself, rather than calling numerous lay witnesses. This Court explained: “The testimony with regard to Lynch’s personal history and background merely corroborated or slightly expanded upon penalty-phase testimony, and this Court has held that ‘even if alternate witnesses could provide more detailed testimony, trial counsel is not ineffective for failing to present cumulative evidence.’ ” 2 So.3d at 71 (quoting
 
 Darling,
 
 966 So.2d at 377). Likewise, in
 
 Darling,
 
 this Court rejected a claim that counsel was deficient for failing to present mitigating evidence where the evidentiary-hearing testimony generally was “only a more detailed presentation” of the mitigation previously presented. 966 So.2d at 377. This Court reasoned:
 

 Although Darling further asserts that trial counsel was also ineffective for failing to present the testimony of Darling’s father, Carlton, during the penalty phase, as noted by the trial court, the substance of Carlton’s testimony was actually presented through other witnesses during the penalty phase. Dr. Hercov and Darling’s mother and sister testified during the penalty phase with regard to the abuse Darling suffered at the hands of Carlton. Although as an afterthought Carlton provided a more detailed account with regard to the abuse, this Court has held that even if alternate witnesses could provide more detailed testimony, trial counsel is not ineffective for failing to present cumulative evidence.
 
 See Gudinas v. State,
 
 816 So.2d 1095, 1106 (Fla.2002);
 
 Sweet v. State,
 
 810 So.2d 854, 863-64 (Fla.2002). Therefore, trial counsel was not ineffective for failing to call Carlton as a witness during the penalty phase to present evidence which was generally presented by others.
 

 Id.
 
 Similarly, in this case the mental health experts and lay witnesses who testified during the penalty phase conveyed the substance, though perhaps not all of the details, of the proposed mitigating circumstances to the penalty phase jury. Thus, trial counsel was not ineffective.
 

 Stewart contends that even if the post-conviction evidence was cumulative in character, it was not merely cumulative in effect because it would have corroborated the penalty-phase witnesses’ testimony, rendering the witnesses more persuasive. Stewart asserts that the additional testimony would have rebutted the State’s argument that Moore and Arnold fabricated their account of childhood abuse and alcohol use.
 

 While the State did argue during closing statements that Stewart’s stepsisters had an incentive to make Stewart’s childhood sound as bad as possible, Stewart overlooks that the sentencing court found all of the mitigating factors proposed by the defense. The sentencing court gave “some” weight to each of the statutory mental health mitigating factors, “some” weight to each of the several mitigating factors pertaining to the abuse Stewart suffered as a child, “modest” weight to each of the factors concerning Stewart’s lack of a father
 
 *259
 
 figure, “little” weight to the factors concerning Stewart’s relationship with this mother, “modest” weight to the factors pertaining to Stewart’s alcohol use, and “little” weight to Stewart’s low-normal intelligence and education. The sentencing court explained that it considered Stewart’s family history of mental illness and his suicide attempts in conjunction with other mitigating factors.
 

 Overall, Stewart has not shown that the evidence presented at the evidentiary hearing would have resulted in the finding of less weighty aggravation or more weighty mitigation. Stewart’s case is not like
 
 Parker v. State,
 
 3 So.3d 974, 984 (Fla.2009), where the sentencing court found “[n]o mitigating circumstances, statutory or otherwise,” based on the “bare bones” penalty-phase presentation. Rather, Stewart’s case is more analogous to
 
 Ferrell v. State,
 
 918 So.2d 163 (Fla.2005). In that case, we determined that the defendant could not prove that he was prejudiced from counsel’s failure to present certain witnesses “[i]n light of the cumulative nature of [the] mitigation evidence and the fact that the sentencing judge found these same circumstances in mitigation.”
 
 Id.
 
 at 172;
 
 see also Brown v. State,
 
 894 So.2d 137, 148 (Fla.2004) (concluding that despite eight-to-four jury recommendation defendant did not prove prejudice because the evidentiary hearing testimony about the defendant’s childhood contributed “virtually no new information” beyond the testimony presented at trial). Accordingly, the evidence presented at the postconviction hearing does not undermine confidence in Stewart’s sentence.
 

 C. Defense Witness Marjorie Sawyer
 

 In his third postconviction appellate issue, Stewart contends that the post-conviction court erred in denying his claim that trial counsel was ineffective for failing to object to statements made by defense witness Marjorie Sawyer during cross-examination. Stewart asserts that counsel should have objected to the underlined portions of the following exchange between the prosecutor and Sawyer.
 

 Q Was Mr. Stewart ever violent with you?
 

 A Yes....
 

 Q Um, what did he do to you?
 

 A
 
 He hit me quite a few times and he beat me up a couple of times, choked me more than once in his drunken rages.
 
 And this would all happen when he kept trying for me to, um — don’t know what happened to his daddy; and I didn’t know.
 

 Q Did you ever have to go to the hospital?
 

 A Yes.
 

 Q Due to these beatings?
 

 A Yes, ma’am.
 

 Q Did Mr. Stewart ever tell you about any of his crimes that he committed in 1984 and 1985?
 

 A His crimes that he had—
 

 Q Yes, ma’am?
 

 A — done?
 
 Well, I know he did a few B & E’s or whatever while we were on the streets so, um, we could survive.
 

 Q Did he ever talk to you about the murder of Rueben Diaz or the murder, of, um, Mark Harris or any of the, um, of those violent crimes?
 

 A Um, I believe right after I came back home, he had mentioned to me that he thought he had killed someone; and he broke down.
 

 And — but I don’t know for sure, I don’t know what happened and, um, he mentioned that; but then I don’t quite know for sure, because he was totally mixed up half the time.
 

 Q And you didn’t know what to believe?
 

 
 *260
 
 A Well, I — I did believe the way that he — believed that he did hurt someone; and then after he was talking to, um, a person named “Terry the street man” that we know, um, they would talk a lot about this.
 

 But all I know is
 
 — all
 
 I know is he says, Well, at one time he
 
 — he
 
 killed somebody and he says, “I might do it again, I don’t know.”
 
 And I’m trying to get him calmed down about this; so I didn’t really talk about killing anyone.
 

 During penalty-phase closing argument, the State mentioned that Sawyer testified that Stewart abused her, but the State did not refer to the uncharged burglaries or the comment that Stewart had claimed to have killed.
 

 During the evidentiary hearing, the State called Stewart’s trial counsel, Robert Fraser. Attorney Fraser explained that he called Sawyer to testify because he believed she knew more about Stewart’s life right before the murders than anyone else. Sawyer was able to testify about their employment and living situation, Stewart’s use of alcohol, and Stewart’s continuing fixation with and grief over his mother’s death. Attorney Fraser testified that he thought Sawyer’s testimony would help the jury understand “the picture of a man whose childhood virtually destroyed his adulthood” and would fit in well with Dr. Maher’s diagnosis of PTSD. Attorney Fraser explained that he thought Sawyer’s testimony that Stewart had a temper and was violent when drunk was consistent with his defense that Stewart was “a dysfunctional human being” due to his childhood. Similarly, attorney Fraser testified that he did not object to Sawyer’s testimony about Stewart committing burglaries while homeless because the jury was already aware of other more serious collateral crimes and because the evidence fit the theme of the defense. Attorney Fraser testified that he could not remember making a conscious decision about whether to object to the comment that Stewart might kill again.
 

 The postconviction court denied the claim of ineffective assistance of counsel because it concluded that Stewart did not prove prejudice. Because we agree that Stewart did not establish that he was prejudiced by the testimony, we do not decide whether reasonable defense counsel should have objected to the challenged portions of the cross-examination. The testimony elicited from Sawyer does not undermine confidence in Stewart’s sentence.
 

 In the instant case, Stewart’s violent and criminal nature was well known to the jury independently of Sawyer’s testimony. In reference to the prior violent felony aggravating factor, the State informed the jury that besides the Diaz murder, Stewart had been convicted of another murder, two attempted murders, armed robbery, attempted robbery, and aggravated assault. Sawyer did not specify when Stewart commented that he thought he killed someone and might kill again. Thus, as the post-conviction court notes in its order, the jury could have assumed that the comment occurred between the murders or attempted murders about which the State presented other evidence. The evidence of the prior convictions also informed the jury that Stewart was violent and willing to steal, regardless of whether Sawyer had testified about the domestic abuse and the burglaries. Given this context, the jury would not necessarily have been influenced by any improper aspects of Sawyer’s testimony.
 

 Furthermore, during closing arguments, the State mentioned that Stewart was violent to Sawyer, but the State did not mention the other uncharged crimes or argue that the jury should consider Stewart’s propensity for dangerousness. As a re-
 
 *261
 
 suit, the jury was reminded of little of the now challenged testimony before its deliberations. Instead, the jury was expressly told that it should consider only three aggravating circumstances: whether the crime was committed while Stewart was under a sentence of imprisonment; whether Stewart had been previously convicted of another capital offense or of a felony involving the use or threat of violence; and whether the crime was committed for financial gain. These instructions channeled the jury’s deliberations and mitigated the effect of any improper evidence.
 
 Cf. Anderson v. State,
 
 18 So.3d 501, 517-18 (Fla.2009) (concluding defendant was not prejudiced by defense counsel’s failure to object to prosecutor’s inaccurate description of weighing process where trial court properly instructed jury on how to weigh aggravating and mitigating factors).
 

 In addition, Stewart does not explain how Sawyer’s comments impacted the jury’s recommendation of death, the sentencing court’s weighing of aggravating and mitigating factors, or this Court’s conclusion that the death penalty was proportionate. In
 
 Owen,
 
 986 So.2d at 553, a detective testified that the defendant had stated that he took “advantage of [the victim’s] shit” because “she wasn’t that bad looking.” On appeal, this Court determined that Owen could not demonstrate that he was prejudiced by the testimony about an uncharged sexual battery because “all four aggravating factors were proven beyond a reasonable doubt, independent of Owen’s statements about the Manley sexual battery, and the trial judge found both statutory mental health mitigating factors and two nonstatutory mental health mitigating factors to be established despite Owen’s account.”
 
 Id.
 
 at 554. Similarly, in Stewart’s case, the sentencing court’s order does not reference any improper aggravation and found all of the mitigating factors proposed by the defense. And again, the sentencing court found that the circumstances properly underlying the pri- or violent felony aggravating factor were “so egregious” and “so horrific” that that factor alone far outweighed all of the mitigation presented. Given the sentencing court’s conclusion regarding the aggravating and mitigating factors, trial counsel’s failure to object to the evidence of other criminal acts does not undermine confidence in Stewart’s sentence.
 

 III. PETITION FOR WRIT OF HABEAS CORPUS
 

 Stewart raises four claims in his petition for a writ of habeas corpus. He claims that (A) appellate counsel was ineffective for failing to challenge on appeal the constitutionality of Florida’s method of execution and lethal injection protocol; (B) the penalty-phase jury instructions unconstitutionally shifted the burden of proof to the defendant to establish mitigating factors and appellate counsel was ineffective for failing to challenge the instructions on appeal; (C) the penalty-phase jury instructions unconstitutionally minimized the role of the jury in Florida’s capital sentencing process and appellate counsel was ineffective for failing to challenge the instructions on appeal; and (D) appellate counsel was ineffective during Stewart’s direct appeal.
 

 Consistent with the
 
 Strickland
 
 standard, to grant habeas relief based on ineffectiveness of counsel, this Court must determine
 

 first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to under
 
 *262
 
 mine confidence in the correctness of the result.
 

 Pope v. Wainwright,
 
 496 So.2d 798, 800 (Fla.1986);
 
 see also Thompson v. State,
 
 759 So.2d 650, 660 (Fla.2000). Each of Stewart’s habeas claims is without merit.
 

 A. Constitutionality of Florida’s Lethal Injection Protocol
 

 Stewart contends that his appellate counsel was ineffective for failing to challenge on direct appeal Florida’s use of lethal injection and its lethal injection protocol. “A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time.”
 
 Strickland,
 
 466 U.S. at 689, 104 S.Ct. 2052. The State is correct that when Stewart’s direct appeal was filed in 2001, reasonable appellate counsel could not be expected to anticipate the litigation and revised protocol that followed the 2006 Angel Diaz execution. This Court rejected a similar habeas claim in
 
 Chavez v. State,
 
 12 So.3d 199 (Fla.),
 
 cert. denied,
 
 — U.S. -, 130 S.Ct. 501, 175 L.Ed.2d 356 (2009). We explained that “[a]t the time of the direct appeal in this case, there was simply no basis upon which to present a mode-of-execution challenge to Florida’s original lethal-injection protocol. The protocol was new, unimplemented, and widely regarded as a humane, civilized alternative to death by electrocution.”
 
 Id.
 
 at 213. Stewart’s claim is also without merit because this Court has repeatedly held that Florida’s current lethal injection protocol is constitutional under
 
 Baze v. Rees,
 
 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008).
 
 See, e.g., Ventura v. State,
 
 2 So.3d 194, 200 (Fla.),
 
 cert. denied,
 
 — U.S. -, 129 S.Ct. 2839, 174 L.Ed.2d 562 (2009). “Appellate counsel cannot be deemed ineffective for failing to raise a meritless argument.”
 
 Smithers v. State,
 
 18 So.3d 460, 473 (Fla.2009) (quoting
 
 Evans v. State,
 
 975 So.2d 1035, 1043 (Fla.2007)).
 

 B. Penalty-Phase Jury Instructions About Mitigating Factors
 

 Stewart asserts that the penalty-phase jury instructions used in his case unconstitutionally shifted the burden of proof to him to establish mitigating factors and that appellate counsel was ineffective for failing to challenge the instructions on appeal. Stewart’s substantive challenge to the jury instructions is procedurally barred because it could have been raised on direct appeal.
 
 See, e.g., Grim v. State,
 
 971 So.2d 85, 103 (Fla.2007) (holding that habeas claim regarding constitutionality of standard jury instructions was procedurally barred). In addition, both Stewart’s challenge to the instructions and his claim that appellate counsel was ineffective are without merit.
 

 Stewart concedes that the standard jury instructions regarding aggravating and mitigating factors were used in his case. We have previously rejected the arguments raised by Stewart and upheld the standard instructions as constitutional.
 
 See, e.g., Johnson v. State,
 
 969 So.2d 938, 961-62 (Fla.2007) (rejecting arguments that standard instructions unconstitutionally place burden of proof on defendant to prove death sentence is inappropriate and improperly restrict evidence that jury may consider in mitigation). Stewart offers no reason why we should depart from precedent. Accordingly, his constitutional challenge is without merit, and thus appellate counsel was not ineffective for failing to raise such an argument on appeal.
 
 See Smithers,
 
 18 So.3d at 473 (holding that appellate counsel cannot be found ineffective for failing to raise a meritless issue).
 

 
 *263
 
 C. Penalty-Phase Instructions About Jury’s Role in Sentencing
 

 Next, Stewart asserts that the standard penalty-phase jury instructions used in his ease minimized the role of the jury in Florida’s capital sentencing process in violation of
 
 Caldwell v. Mississippi,
 
 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and that appellate counsel was ineffective for failing to challenge the instructions bn appeal. Again, Stewart’s substantive challenge to the jury instructions is procedurally barred because it could have been raised on direct appeal.
 
 See, e.g., Grim,
 
 971 So.2d at 103. Moreover, Stewart concedes that we have repeatedly held that Florida’s standard jury instructions do not violate
 
 Caldwell. See, e.g., Lebron v. State,
 
 982 So.2d 649, 666 (Fla.2008). Stewart offers no reason why we should depart from precedent. Accordingly, his constitutional challenge is without merit, and appellate counsel was not ineffective for failing to raise such an argument on appeal.
 
 See Smithers,
 
 18 So.3d at 473.
 

 D. Cumulative Ineffectiveness of Appellate Counsel
 

 In his final habeas claim, Stewart reasserts his arguments that appellate counsel was ineffective for failing to challenge the standard jury instructions used in Stewart’s case and for failing to challenge Florida’s method of execution and lethal injection protocol. As discussed above, Stewart’s arguments are without merit, and appellate counsel cannot be deemed ineffective for failing to raise a meritless issue on direct appeal. Therefore, Stewart is not entitled to habeas relief.
 

 IV. CONCLUSION
 

 For the reasons stated above, we affirm the circuit court’s denial of Stewart’s motion for postconviction relief and deny his petition for a writ of habeas corpus.
 

 It is so ordered.
 

 PARIENTE, LEWIS, CANADY, POLSTON, LABARGA, and PERRY, JJ„ concur.
 

 QUINCE, C.J., recused.
 

 [1]
 

 . Stewart does not appeal the denial of his claims that his right to confrontation was violated during the examination of Sawyer; his right to confrontation was violated during the examinations of Michele Acosta and James Harville; his death sentence is unconstitutional under
 
 Roper v. Simmons,
 
 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005); cumulative error deprived him of a fundamentally fair trial; trial counsel was ineffective for failing to request an instruction or present evidence about Stewart's likelihood of parole; trial counsel was ineffective for conceding that the State had established three aggravating factors; the jury’s role was diminished in violation of
 
 Caldwell v. Mississippi,
 
 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); and execution by lethal injection is cruel or unusual punishment.